OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                Plaintiff,

          -against-

FIRST HORIZON NATIONAL
CORPORATION, FIRST TENNESSEE
BANK NATIONAL ASSOCIATION, FTN
FINANCIAL SECURITIES
CORPORATION, FIRST HORIZON ASSET
SECURITIES, INC., UBS SECURITIES,
LLC, J.P. MORGAN SECURITIES LLC,
CREDIT SUISSE SECURITIES (USA) LLC
(f/k/a CREDIT SUISSE FIRST BOSTON
LLC), MERRILL LYNCH, PIERCE,
FENNER & SMITH, INC., GERALD L.
BAKER, PETER F. MAKOWIECKI,
CHARLES G. BURKETT, AND THOMAS J.
WAGEMAN,

              Defendants.

---

**11 CIV. 6193 (DLC)**

**<u>AMENDED COMPLAINT</u>**

**<u>JURY TRIAL DEMANDED</u>**



**<u>June 28, 2012</u>**

## <u>TABLE OF CONTENTS</u>

NATURE OF ACTION ..........................................................................................1

PARTIES ...........................................................................................................5

    *The Plaintiff and the GSEs*..........................................................................5

    *The Defendants* ..........................................................................................6

JURISDICTION AND VENUE ..........................................................................10

FACTUAL ALLEGATIONS ..............................................................................11

I.      THE SECURITIZATIONS..........................................................................11

    A.    Residential Mortgage-Backed Securitizations in General ...................11

    B.    The Securitizations at Issue in This Case .............................................12

    C.    The Securitization Process....................................................................13

          1.    First Horizon Home Loan Groups Mortgage Loans in Special
               Purpose Trusts..................................................................................13

          2.    The Trusts Issue Securities Backed by the Loans.....................15

II.    THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION
       PROCESS ....................................................................................................17

    A.    The Role of Each Defendant.................................................................17

          1.    First Horizon Home Loan (now First Tennessee)....................18

          2.    First Horizon Asset Securities ................................................18

          3.    First Horizon National .............................................................19

          4.    Underwriter Defendants............................................................20

          5.    Individual Defendants...............................................................21

    B.    Defendants' Failure To Conduct Proper Due Diligence.......................23

          1.    UBS...........................................................................................24

          2.    Bear Stearns (now JP Morgan Securities) ...............................26

          3.    Credit Suisse .............................................................................28

i

          4.      Merrill Lynch ................................................................................31

    C.     Additional Allegations Regarding the Liability of JP Morgan Securities as Successor to Bear Stearns .........................................................................33

III.    THE STATEMENTS IN THE REGISTRATION STATEMENTS.................................35

    A.     Compliance With Underwriting Guidelines .................................................35

    B.     Statements Regarding Occupancy Status of Borrowers ........................................38

    C.     Statements Regarding Loan-to-Value Ratios............................................40

    D.     Statements Regarding Credit Ratings ....................................................42

IV.    FALSITY OF STATEMENTS IN THE PROSPECTUS SUPPLEMENTS ....................44

    A.     The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False or Misleading ...........44

          1.      Owner-Occupancy Data Was Materially False.........................................44

          2.      LTV Data Was Materially False ................................................46

    B.     The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines .........................................49

          1.      First Horizon Home Loan Failed To Adhere to Its Underwriting Guidelines ................................................................................50

          2.      The Collapse of the GSE Certificates' Credit Ratings Further Indicates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines ...................................58

          3.      The Surge in Mortgage Delinquencies and Defaults Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines ...................................60

V.    FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES .................................................61

FIRST CAUSE OF ACTION ...................................................................63

SECOND CAUSE OF ACTION ................................................................65

THIRD CAUSE OF ACTION ..................................................................70

FOURTH CAUSE OF ACTION ...............................................................75

FIFTH CAUSE OF ACTION ........................................................................................................79

PRAYER FOR RELIEF ...............................................................................................................83

JURY TRIAL DEMANDED .........................................................................................................84

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of The Federal National Mortgage Association ("Fannie Mae") and The Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Amended Complaint herein against First Horizon National Corporation ("First Horizon National"), First Tennessee Bank National Association ("First Tennessee") (successor to First Horizon Home Loan Corporation ("First Horizon Home Loan")), FTN Financial Securities Corporation ("FTN"), First Horizon Asset Securities, Inc. ("First Horizon Asset Securities") (collectively, "First Horizon"); UBS Securities, LLC ("UBS"); J.P. Morgan Securities LLC ("JP Morgan Securities") (as successor to Bear, Stearns & Co. Inc. ("Bear Stearns")); Credit Suisse Securities (USA) LLC ("Credit Suisse") (f/k/a Credit Suisse First Boston LLC); Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"); and Gerald L. Baker, Peter F. Makowiecki, Charles G. Burkett, and Thomas J. Wageman (the "Individual Defendants") (all together, the "Defendants") alleges as follows:

## NATURE OF ACTION

1.     This action arises out of Defendants' actionable conduct in connection with the offer and sale of certain residential mortgage-backed securities ("RMBS") to Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs").  These securities were sold pursuant to a registration statement, including prospectuses and prospectus supplements that formed part of that registration statement, which contained materially false or misleading statements and omissions.  Defendants falsely stated that the underlying mortgage loans and properties complied with certain underwriting guidelines and standards.  These false statements and misleading omissions significantly overstated the ability of the borrowers to repay their mortgage loans and the value of the collateralized properties.  These statements were material to the GSEs, as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and

1

15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code.

2.      Between September 30, 2005, and April 30, 2007, Fannie Mae and Freddie Mac purchased $883 million in residential mortgage-backed securities (the "GSE Certificates") issued in connection with five First Horizon-sponsored and First Horizon-underwritten securitizations.[1] The GSE Certificates purchased by Freddie Mac, along with the date and amount of the purchases, are listed *infra* in Table 10.  The GSE Certificates purchased by Fannie Mae, along with the date and amount of the purchases, are listed *infra* in Table 11.  The five securitizations at issue are:

(i)      First Horizon Alternative Mortgage Securities Trust 2005-AA9 ("FHAMS 2005-AA9");

(ii)     First Horizon Alternative Mortgage Securities Trust 2005-AA10 ("FHAMS 2005-AA10");

(iii)    First Horizon Alternative Mortgage Securities Trust 2005-AA11 ("FHAMS 2005-AA11");

(iv)     First Horizon Alternative Mortgage Securities Trust 2005-AA12 ("FHAMS 2005-AA12"); and

(v)      First Horizon Alternative Mortgage Securities Trust 2006-AA1 ("FHAMS 2006-AA1")

(collectively, the "Securitizations").

3.      The Certificates were offered for sale pursuant to a shelf registration statement (the "Shelf Registration Statement") filed with the Securities and Exchange Commission (the "SEC").  Defendant First Horizon Asset Securities filed the Shelf Registration Statement on May 23, 2005 that pertained to the five Securitizations at issue in this action.  An amendment

---

[1]   For purposes of this Amended Complaint, the securities issued under the Registration Statement (as defined in note 2, *infra*) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates."  Holders of Certificates are referred to as "Certificateholders."

was filed on July 29, 2005.  The Shelf Registration Statement and amendment were signed by or on behalf of the Individual Defendants.  With respect to all of the Securitizations, FTN was an underwriter, and, with respect to one of the Securitizations, FTN was also the lead underwriter and the underwriter who sold the GSE Certificates to Freddie Mac.

4.      For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement[2] for that Securitization.  The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the Registration Statement, including the Shelf Registration Statement and the corresponding Prospectuses and Prospectus Supplements.

5.      The Registration Statement contained statements about the characteristics and credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the borrowers of those underlying mortgage loans, and the origination and underwriting practices used to make and approve the loans.  Such statements were material to a reasonable investor's, including the GSEs', decision to invest in mortgage-backed securities by purchasing the Certificates.  Unbeknownst to Fannie Mae and Freddie Mac, these statements were materially false, as significant percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices, and had materially poorer credit quality than what was represented in the Registration Statement.

6.      The Registration Statement also contained statistical summaries of the collateral groups and the entire group of mortgage loans in each Securitization, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate

---

[2]   The term "Registration Statement," as used herein, incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

principal balance with loan-to-value ratios within specified ranges.  This information was material to reasonable investors.  However, a loan-level analysis of a sample of loans for each Securitization—a review that encompassed thousands of mortgages across all of the Securitizations—has revealed that these statistics were false and omitted material facts due to widespread falsification of borrowers' incomes and debts, inflated property values, and misrepresentations of other key characteristics of the mortgage loans.

7.     For example, the percentage of owner-occupied properties is a material risk factor to purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property.  The loan-level review reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than was stated in the Prospectus Supplements.  Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans, and the actual ability of the individual mortgage holders to satisfy their debts.

8.     Defendants First Horizon Asset Securities (the depositor) and the Individual Defendants (as signatories) are directly responsible for the misstatements and omissions of material fact contained in the Registration Statement because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac. Defendants FTN, UBS, JP Morgan Securities (as successor-in-interest to Bear Stearns), Credit Suisse, and Merrill Lynch (collectively, the "Underwriter Defendants") are also directly responsible for the misstatements and omissions of material fact contained in the Registration Statement for the Securitizations on which they were underwriters (as reflected in Table 1, *infra*)

4

because they prepared and/or used the Registration Statement to market and sell the Certificates to Fannie Mae and Freddie Mac.

9.      Defendants First Tennessee (as successor-in-interest to First Horizon Home Loan) and First Horizon National are also responsible for the misstatements and omissions of material fact contained in the Registration Statement by virtue of their direction and control over Defendants First Horizon Asset Securities and FTN.  First Tennessee and First Horizon National directly participated in and exercised dominion and control over the business operations of Defendants First Horizon Asset Securities and FTN.

10.     Fannie Mae and Freddie Mac purchased $883 million of the Certificates pursuant to the Registration Statement filed with the SEC.  The Registration Statement contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans and the practices used to originate and underwrite such loans.  As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

11.     FHFA, as Conservator of Fannie Mae and Freddie Mac, brings this action against Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77k, 77*l*(a)(2), 77o, and violations of Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code.

## PARTIES

### The Plaintiff and the GSEs

12.     The Federal Housing Finance Agency is a federal agency located at Constitution Center, 400 7th Street, SW in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the

Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed

Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  In that

capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including, but

not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and

Freddie Mac.  12 U.S.C. § 4617(b)(2).

13.    Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by

Congress with a mission to provide liquidity, stability, and affordability to the United States

housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in

residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW

in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

### The Defendants

14.    Defendant First Horizon National is a national financial services institution and

one of the largest bank holding companies in the United States.  It is the parent company of

Defendant First Tennessee; was the ultimate parent company of First Horizon Home Loan when

First Horizon Home Loan had a separate corporate existence; and is the ultimate corporate parent

of First Horizon Asset Securities and FTN.  First Horizon National's principal office in the

United States is located at 165 Madison Way, Memphis, Tennessee.

15.    Defendant First Tennessee is engaged in a variety of capital markets-related

activities, including purchases and sales of loan portfolios, sales of assets for inclusion in

securitizations, and origination and acquisition of loans.  First Tennessee is a national banking

association organized and existing under the laws of the United States with its principal place of

business at 165 Madison Way, Memphis, Tennessee.

16.    Defendant First Tennessee is the successor-in-interest to First Horizon Home

Loan, and thus all allegations herein against First Horizon Home Loan are made against First

Tennessee.  First Horizon Home Loan acted as the sponsor, seller, and master servicer of the Securitizations and was, at all relevant times, a wholly owned subsidiary of First Tennessee. First Horizon Home Loan was the direct parent and controlling entity of the depositor First Horizon Asset Securities.  It was pursuant to a merger effective May 31, 2007 that First Horizon Home Loan was merged into its parent, First Tennessee.  Though it ceased to exist as a separate legal entity, First Horizon Home Loan continues to operate as a division of First Tennessee.  In First Horizon National's Annual Report for 2007, First Horizon Home Loan is referenced as "a division of First Tennessee Bank National Association."  An affidavit filed by an employee of First Tennessee further confirms that First Horizon Home Loan is a "division of First Tennessee Bank National Association[,] successor in interest by merger to First Horizon Home Loan Corporation."  *See* Affidavit of Peggy M. Mullins, *Read v. Teton Springs Golf & Casting Club, LLC*, No. 4:08-CV-00099 (D. Idaho Mar. 31, 2010) (Docket No. 434).

17.    Defendant FTN is an SEC-registered broker-dealer and, at all relevant times, was an underwriter of mortgage and asset-backed securities in the United States.  FTN is incorporated in Tennessee with its principal place of business at 845 Crossover Lane, Memphis, Tennessee.  It maintains an office at 444 Madison Avenue, New York, New York.  FTN is an indirect, wholly owned subsidiary of First Horizon National, and operates as a subsidiary of Defendant First Tennessee.  FTN was the lead underwriter for the FHAMS 2005-AA10 Securitization, and also acted as underwriter for each of the offerings at issue in this action.  As such, FTN was intimately involved in all the offerings.

18.    Defendant First Horizon Asset Securities is incorporated in Delaware and has its principal place of business at 4000 Horizon Way, Irving, Texas.  First Horizon Asset Securities was, at all relevant times, a wholly owned subsidiary of First Horizon Home Loan.  As a result of

7

the merger of First Horizon Home Loan into First Tennessee, First Horizon Asset Securities is

now a wholly owned subsidiary of First Tennessee.  First Horizon Asset Securities was the

depositor for the Securitizations and, as depositor, was responsible for registering the Certificates

with the SEC and preparing and filing reports required under the Securities Exchange Act of

1934.

19.     Defendant UBS is an SEC-registered broker-dealer and, at all relevant times, was

one of the leading underwriters of mortgage and asset-backed securities in the United States.

UBS is a limited liability company incorporated in Delaware with its principal place of business

at 677 Washington Boulevard, Stamford, Connecticut.  It also maintains an office at 299 Park

Avenue in New York, New York.  UBS was the lead underwriter for FHAMS 2005-AA11 and

was intimately involved in that offering.

20.     Defendant JP Morgan Securities is an SEC-registered broker-dealer and the

successor-in-interest to Bear Stearns, and thus all allegations herein against Bear Stearns are

made against JP Morgan Securities.  Bear Stearns was a Delaware corporation with its principal

place of business in New York, New York.  It acted as the lead underwriter for FHAMS 2005-

AA12 and was intimately involved in that offering.  Pursuant to a Merger Agreement effective

May 30, 2008, Bear Stearns' parent company, The Bear Stearns Companies Inc., merged with

Bear Stearns Merger Corporation, a wholly owned subsidiary of JPMorgan Chase & Co.

("JPMorgan Chase"), making Bear Stearns a wholly owned indirect subsidiary of JPMorgan

Chase.  Following the merger, on or about October 1, 2008, Bear Stearns merged with a

subsidiary of JPMorgan Chase, J.P. Morgan Securities Inc., which subsequently changed its

name to J.P. Morgan Securities LLC.  Thus, Bear Stearns is now doing business as Defendant JP

Morgan Securities.  Defendant JP Morgan Securities is a Delaware corporation with its principal

place of business at 277 Park Avenue, New York, New York.

21.     Defendant Credit Suisse (f/k/a Credit Suisse First Boston LLC) is a SEC-

registered broker-dealer primarily engaged in the business of investment banking.  It is a

Delaware limited liability company with its principal place of business at 11 Madison Avenue,

New York, New York.  Defendant Credit Suisse acted as the lead underwriter for FHAMS 2006-

AA1 and was intimately involved in that offering.

22.     Defendant Merrill Lynch is an SEC-registered broker-dealer and a Delaware

corporation with its principal place of business at 250 Vesey Street, New York, New York.  It

acted as the lead underwriter for FHAMS 2005-AA9 and was intimately involved in that

offering.

23.     Defendant Gerald L. Baker is an individual residing in Memphis, Tennessee.  At

the time of the Securitizations, Mr. Baker was:  (a) the Chief Executive Officer, President, and a

Director of Defendant First Horizon Asset Securities; (b) the Chief Executive Officer and

President of Defendant First Tennessee; and (c) the President and Chief Executive Officer of

Defendant First Horizon National.  Mr. Baker signed the Shelf Registration Statement and the

amendment thereto.

24.     Defendant Peter F. Makowiecki is an individual residing in Texas.  At the time of

the Securitizations, Mr. Makowiecki was:  (a) the Chief Financial Officer and Treasurer of

Defendant First Horizon Asset Securities; and (b) the President and Chief Executive Officer of

Defendant First Horizon Home Loan beginning in January 2006, after previously serving as its

Chief Financial Officer.  Mr. Makowiecki signed the Shelf Registration Statement and the

amendment thereto.

25.      Defendant Charles G. Burkett is an individual residing in Memphis, Tennessee. At the time of the Securitizations, Mr. Burkett was:  (a) a Director of First Horizon Asset Securities; (b) the President of Banking of Defendant First Tennessee; and (c) the President of Banking of Defendant First Horizon National.  Mr. Burkett signed the Shelf Registration Statement and the amendment thereto.

26.      Defendant Thomas J. Wageman is an individual residing in Texas.  At the time of the Securitizations, Mr. Wageman was a Director of Defendant First Horizon Asset Securities. Mr. Wageman signed the Shelf Registration Statement and the amendment thereto.

## JURISDICTION AND VENUE

27.      Jurisdiction of this Court is founded upon 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims brought by FHFA in its capacity as conservator of Fannie Mae and Freddie Mac.

28.      Jurisdiction of this Court is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

29.      This Court has jurisdiction over the statutory claims of violations of Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

30.      Venue is proper in this district pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1391(b).  JPMorgan Securities, Credit Suisse, and Merrill Lynch are principally located in this district, FTN and UBS also maintain offices in this district, and many of the acts and transactions alleged herein, including the preparation and dissemination of

the Registration Statements, occurred in substantial part within this district.  Defendants are also subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### I.   THE SECURITIZATIONS

#### A.   Residential Mortgage-Backed Securitizations in General

31.   Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

32.   The most common form of securitization of mortgage loans involves a sponsor— the entity that acquires or originates the mortgage loans and initiates the securitization—and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  The trust is generally established pursuant to a Pooling and Servicing Agreement entered into by, among others, the depositor for that securitization.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

33.   Residential mortgage-backed securities are backed by the underlying mortgage loans.  Some residential mortgage-backed securitizations are created from more than one pool of loans called collateral groups, in which case the trust issues securities backed by different groups.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn

owns the loans.  Within this framework, the purchasers of the securities acquire rights to the cashflows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

34.     Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage groups underlying the certificates.  Certificates are issued by the trust pursuant to the registration statement and the prospectus and prospectus supplement. Underwriters sell the certificates to investors.

35.     A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans.  The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

**B.     The Securitizations at Issue in This Case**

36.     This case involves the five Securitizations listed in paragraph 2 *supra*, which were sponsored and structured by First Horizon Home Loan and underwritten by FTN and others.  For each Securitization, Table 1 identifies:  (1) the sponsor; (2) the depositor; (3) the underwriters; (4) the principal amount issued for the tranches[3] purchased by the GSEs; (5) the date of issuance;

---

[3]   A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

and (6) the loan group backing the GSE Certificates for that Securitization (referred to as the "Supporting Loan Group").

**Table 1**

| Transaction | Tranche | Sponsor | Depositor | Underwriters | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| FHAMS 2005-AA9 | II-A-1 | First Horizon Home Loan | First Horizon Asset Securities | Merrill Lynch, Citigroup, FTN | 214,030,000 | Sept. 30, 2005 | Group 2 |
| FHAMS 2005-AA10 | I-A-1 | First Horizon Home Loan | First Horizon Asset Securities | FTN, Goldman Sachs | 140,430,000 | Oct.  28, 2005 | Group 1 |
| FHAMS 2005-AA11 | I-A-1 | First Horizon Home Loan | First Horizon Asset Securities | UBS, Lehman Brothers, FTN | 128,755,000 | Nov. 30, 2005 | Group 1 |
| FHAMS 2005-AA12 | II-A-1 | First Horizon Home Loan | First Horizon Asset Securities | Bear Stearns (now JP Morgan Securities), FTN | 213,133,000 | Dec. 29, 2005 | Group 2 |
| FHAMS 2006-AA1 | I-A-1 | First Horizon Home Loan | First Horizon Asset Securities | Credit Suisse, FTN | 230,020,000 | Feb. 28, 2006 | Group 1 |

### C.    The Securitization Process

#### 1.    First Horizon Home Loan Groups Mortgage Loans in Special Purpose Trusts

37.    As the sponsor for the Securitizations, First Horizon Home Loan originated or purchased the mortgage loans after they were originated, either directly from the originators or through affiliates of the originators.

38.    Pursuant to a Mortgage Loan Purchase Agreement, First Horizon Home Loan then sold the mortgage loans to the depositor, which was its affiliate, Defendant First Horizon Asset Securities.  (In FHAMS 2005-AA10, the loans were passed first to Defendant First Tennessee under a "FTBNA Purchase Agreement," then to the depositor pursuant to a "Depositor Purchase Agreement.")  The Mortgage Loan Purchase Agreement and the FTBNA

13

Purchase Agreement contained representations and warranties regarding the characteristics of the mortgage loans. The Depositor Purchase Agreement in FHAMS 2005-AA10 assigned the rights to the representations and warranties in the FTBNA Purchase Agreement to the depositor.

39.     Defendant FTN was either the lead or an additional underwriter for each of the Securitizations, and it was the selling underwriter for FHAMS 2005-AA10.

40.     First Horizon Asset Securities was First Horizon Home Loan's wholly owned, limited-purpose financial subsidiary. The sole purpose of First Horizon Asset Securities as depositor was to act as a conduit through which loans originated or acquired by the sponsor First Horizon Home Loan could be securitized and sold to investors.

41.     As depositor for the Securitizations, First Horizon Asset Securities transferred the relevant mortgage loans to the trusts, pursuant to a Pooling and Servicing Agreement ("PSA") that contained various representations and warranties regarding the mortgage loans for the Securitizations, and/or assigned the rights to the representations and warranties in the Mortgage Loan Purchase Agreement (or, in the case of FHAMS 2005-AA10, in the FTBNA Purchase Agreement) to the trusts.

42.     As part of each of the five Securitizations, the trustee, on behalf of the Certificateholders, executed a PSA with First Horizon Home Loan and First Horizon Asset Securities, the parties responsible for monitoring and servicing the mortgage loans in the Securitizations. The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued certificates, including the GSE Certificates backed by such loans. The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

### 2. The Trusts Issue Securities Backed by the Loans

43. Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans. The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the assets of the corresponding trust. Each Certificate entitles its holder to a specified portion of the cashflows from the underlying mortgages in the Supporting Loan Group. The level of risk inherent in the Certificates was a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

44. The Certificates were issued pursuant to a Shelf Registration Statement filed with the SEC on a Form S-3. The Shelf Registration Statement was amended by a Form S-3/A filed with the SEC (the "Amendment"). Each Individual Defendant signed the Shelf Registration Statement that was filed by First Horizon Asset Securities. Defendant Baker signed the Amendment in his capacity as President and Chief Executive Officer of First Horizon Asset Securities, and on behalf of Defendants Makowiecki, Burkett, and Wageman, as their attorney-in-fact, pursuant to a power of attorney duly executed by each and previously filed.

45. The SEC filing number, registrant, signatories, and filing dates of the Shelf Registration Statement and Amendment, as well as the Certificates covered, are reflected in Table 2 below.

**Table 2**

| SEC File No. | Date Registration Statement Filed | Date Amended Registration Statement Filed | Registrant | Covered Certificates | Signatories of Registration Statement and Amendment |
|---|---|---|---|---|---|
| 333-125158 | May 23, 2005 | July 29, 2005 | First Horizon Asset Securities | FHAMS 2005-AA9 FHAMS 2005-AA10 FHAMS 2005-AA11 FHAMS 2005-AA12 FHAMS 2006-AA1 | Gerald Baker Peter Makowiecki Charles Burkett Thomas Wageman |

46.     The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios, the geographic distribution of the loans, and the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

47.     The Prospectus Supplement associated with each Securitization was filed with the SEC as part of the Shelf Registration Statement.  The Form 8-K attaching the PSA for FHAMS 2006-AA1 was also filed with the SEC.  The dates on which the Prospectus Supplement and that Form 8-K were filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 3 below.

**Table 3**

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA Filed | Filing No. of Related Registration Statement |
|---|---|---|---|
| FHAMS 2005-AA9 | Sept. 28, 2005 | N/A | 333-125158 |
| FHAMS 2005-AA10 | Oct. 26, 2005 | N/A | 333-125158 |
| FHAMS 2005-AA11 | Nov. 29, 2005 | N/A | 333-125158 |
| FHAMS 2005-AA12 | Dec. 23, 2005 | N/A | 333-125158 |
| FHAMS 2006-AA1 | Mar. 1, 2006 | Mar. 14, 2006 | 333-125158 |

48.     The Certificates were issued pursuant to the PSAs, and Defendant First Horizon Asset Securities and the Underwriter Defendants offered and sold the GSE Certificates to Fannie

Mae or Freddie Mac pursuant to the Registration Statement, which, as noted previously, included the Prospectuses and Prospectus Supplements.

49.     Defendant First Horizon Asset Securities and the Underwriter Defendants targeted Fannie Mae in Washington, D.C., and Freddie Mac in Virginia.  Defendant First Horizon Asset Securities and the Underwriter Defendants sent offering materials, including the Prospectuses and Prospectus Supplements, to Fannie Mae in Washington, D.C., and Freddie Mac in Virginia.  Defendants First Horizon Asset Securities and the Underwriter Defendants knew that Fannie Mae was located in the District of Columbia and that Freddie Mac was located in Virginia.

## II.     THE DEFENDANTS' PARTICIPATION IN THE SECURITIZATION PROCESS

### A.     The Role of Each Defendant

50.     Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing for at least one of the Certificates, which included either originating or purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to investors including Fannie Mae and Freddie Mac.

51.     With respect to each Securitization, the depositor, underwriters, and Individual Defendants who signed the Registration Statement, as well as the Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance, and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

17

### 1.  First Horizon Home Loan (now First Tennessee)

52.     First Horizon Home Loan (now First Tennessee) was, at all relevant times, in the business of originating, purchasing, selling, and servicing mortgage loans.  As of June 30, 2005, First Horizon Home Loan provided servicing for mortgage loans with an aggregate principal balance of approximately $90.73 billion.

53.     First Horizon Home Loan was the sponsor of the Securitizations.  In that capacity, First Horizon Home Loan determined the structure of the Securitizations, initiated the Securitizations, originated or purchased the mortgage loans to be securitized, and determined the distribution of principal and interest.  First Horizon Home Loan also selected First Horizon Asset Securities as the special-purpose vehicle that would be used to transfer the mortgage loans from First Horizon Home Loan to the trusts, and selected FTN and the other Underwriter Defendants as underwriters for the Securitizations.  In its role as sponsor, First Horizon Home Loan knew and intended that the mortgage loans it originated and purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

54.     As sponsor of the Securitizations, First Horizon Home Loan also conveyed the mortgage loans to First Horizon Asset Securities, as depositor, pursuant to Mortgage Loan Purchase Agreements.  In these agreements, First Horizon Home Loan made certain representations and warranties to First Horizon Asset Securities regarding the groups of loans collateralizing the Certificates.  These representations and warranties were assigned by First Horizon Asset Securities to the trustees for the benefit of the Certificateholders.

### 2.  First Horizon Asset Securities

55.     Defendant First Horizon Asset Securities is a wholly owned limited purpose finance subsidiary of First Tennessee.  It is a special purpose entity formed solely for the purpose

of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

56.     Defendant First Horizon Asset Securities was the depositor for the Securitizations.  In its capacity as depositor, First Horizon Asset Securities purchased the mortgage loans from First Horizon Home Loan (as sponsor) pursuant to the Mortgage Loan Purchase Agreements.[4]  First Horizon Asset Securities sold, transferred, or otherwise conveyed the mortgage loans to the trusts.  First Horizon Asset Securities, together with the other Defendants, was also responsible for preparing and filing the Registration Statement pursuant to which the Certificates were offered for sale.  The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.  First Horizon Asset Securities was controlled by the Individual Defendants, who served as directors and/or officers of First Horizon Asset Securities.

### 3.     First Horizon National

57.     Defendant First Horizon National employed its wholly owned subsidiaries in the key steps of the securitization process.  Unlike typical arms'-length transactions, the Securitizations here involved various First Horizon National subsidiaries and affiliates at virtually every step in the process.  The sponsor for the Securitizations was First Horizon Home Loan, the depositor was First Horizon Asset Securities, and one of the underwriters—the lead underwriter in the case of FHAMS 2005-AA10—was FTN.

---

[4]   In some of the Securitizations, First Horizon Asset Securities actually purchased the loans from First Tennessee, to which First Horizon Home Loan had previously sold the loans.

58.     First Horizon National profited substantially from this vertically integrated approach to mortgage-backed securitization.  First Horizon Home Loan, First Horizon Asset Securities, and FTN are all included in First Horizon National's 2005 annual report as its "principal corporate subsidiaries."  Further, First Horizon National shares and, on information and belief, shared, overlapping management with the other First Horizon Defendants.  For instance, Defendant Baker was (a) the Chief Executive Officer, President, and a Director of Defendant First Horizon Asset Securities; (b) the Chief Executive Officer and President of Defendant First Tennessee; and (c) the President and Chief Executive Officer of Defendant First Horizon National.

59.     As the ultimate corporate parent of First Horizon Asset Securities and FTN, and the former corporate parent of First Horizon Home Loan, First Horizon National had the practical ability to direct and control the actions of First Horizon Home Loan, First Horizon Asset Securities, and FTN related to the Securitizations, and in fact exercised such direction and control by coordinating the activities of its subsidiaries related to the issuance and sale of the Certificates.

### 4.     Underwriter Defendants

60.     FTN, UBS, Bear Stearns (now JP Morgan Securities), Credit Suisse, and Merrill Lynch were, at all relevant times, registered broker/dealers, and were all among the leading underwriters of mortgage and other asset-backed securities in the United States.

61.     Defendant FTN was the lead underwriter for the FHAMS 2005-AA10 Securitization, and it acted as an additional underwriter for the remaining four Securitizations.  In these roles, FTN was responsible for underwriting the offer of the Certificates issued in all of the Securitizations, as well as for managing the sale of the Certificates issued in the FHAMS 2005-AA10 Securitization to Fannie Mae, Freddie Mac, and other investors.

20

62.     Defendant UBS was the lead underwriter for the FHAMS 2005-AA11 Securitization.  In that role, UBS was responsible for underwriting the offer of the Certificates issued in that Securitization, as well as for managing the sale of the Certificates to Fannie Mae, Freddie Mac, and other investors.

63.     Bear Stearns, now Defendant JP Morgan Securities, was the lead underwriter for the FHAMS 2005-AA12 Securitization.  In that role, Bear Stearns was responsible for underwriting the offer of the Certificates issued in that Securitization, as well as for managing the sale of the Certificates to Fannie Mae, Freddie Mac, and other investors.

64.     Defendant Credit Suisse was the lead underwriter for the FHAMS 2006-AA1 Securitization.  In that role, Credit Suisse was responsible for underwriting the offer of the Certificates issued in that Securitization, as well as for managing the sale of the Certificates to Fannie Mae, Freddie Mac, and other investors.

65.     Defendant Merrill Lynch was the lead underwriter for the FHAMS 2005-AA9 Securitization.  In that role, Merrill Lynch was responsible for underwriting the offer of the Certificates issued in that Securitization, as well as for managing the sale of the Certificates to Fannie Mae, Freddie Mac, and other investors.

66.     Each of the Underwriter Defendants was obligated to conduct meaningful due diligence to ensure that the Registration Statement for the Securitizations they underwrote did not contain any material misstatements or omissions, including the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### 5.     Individual Defendants

67.     Defendant Gerald L. Baker served at the time of the Securitizations as (a) the Chief Executive Officer, President, and a Director of Defendant First Horizon Asset Securities; (b) the Chief Executive Officer and President of Defendant First Tennessee; and (c) the President

21

and Chief Executive Officer of Defendant First Horizon National.  Mr. Baker signed the Shelf

Registration Statement and the amendment thereto.  Upon information and belief, Mr. Baker

remained employed by First Horizon National and First Tennessee at the time the GSE

Certificates were issued pursuant to the Registration Statement.

68.     Defendant Peter F. Makowiecki served at the time of the Securitizations as (a) the

Chief Financial Officer and Treasurer of Defendant First Horizon Asset Securities; and (b) the

President and Chief Executive Officer of Defendant First Horizon Home Loan beginning in

January 2006, after previously serving as its Chief Financial Officer.  Mr. Makowiecki signed

the Shelf Registration Statement and the amendment thereto.  Upon information and belief, Mr.

Makowiecki remained employed by First Horizon Asset Securities and First Horizon Home Loan

at the time the GSE Certificates were issued pursuant to the Registration Statement.

69.     Defendant Charles G. Burkett served at the time of the Securitizations as (a) a

Director of First Horizon Asset Securities; (b) the President of Banking of Defendant First

Tennessee, and (c) the President of Banking of Defendant First Horizon National.  Mr. Burkett

signed the Shelf Registration Statement and the amendment thereto.  Upon information and

belief, Mr. Burkett remained employed by First Horizon Asset Securities, First Tennessee, and

First Horizon National at the time the GSE Certificates were issued pursuant to the Registration

Statement.

70.     Defendant Thomas J. Wageman served at the time of the Securitizations as a

Director of Defendant First Horizon Asset Securities.  Mr. Wageman signed the Shelf

Registration Statement and the amendment thereto.  Upon information and belief, Mr. Burkett

remained a Director of First Horizon Asset Securities at the time the GSE Certificates were

issued pursuant to the Registration Statement.

**B.**      **Defendants' Failure To Conduct Proper Due Diligence**

71.      Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statement.

72.      During the time period in which the Certificates were issued—approximately 2005 through 2006—First Horizon was well-established in the mortgage-backed securitization market.  In an effort to increase revenue and profits in an rapidly expanding market, First Horizon National increased the volume of mortgages it securitized through its subsidiaries First Tennessee and First Horizon Home Loan.  In 2005, First Horizon securitized $892.66 million of mortgage loans.  In 2006, that figure nearly doubled, to $1.74 billion.

73.      Defendants had enormous financial incentives to complete as many offerings as quickly as possible, without regard to ensuring the accuracy or completeness of the Registration Statement or conducting adequate and reasonable due diligence.  First Horizon Asset Securities, as the depositor, was paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations and the Underwriter Defendants were paid commissions based on the amount they received from the sale of the Certificates to the public.

74.      The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statement.  In particular, Defendants failed to conduct adequate due diligence or to otherwise ensure the accuracy of the statements in the Registration Statement pertaining to the Securitizations.

75.      For instance, the Underwriter Defendants routinely retained due diligence providers such as Clayton Holdings, Inc. ("Clayton") to analyze the loans they were considering placing in their securitizations, but waived a significant number of loans into the securitizations

that these firms had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines.  On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations," and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."  The Underwriter Defendants were negligent in allowing into their securitizations a substantial number of mortgage loans that, as reported to them by third-party due diligence firms, did not conform to the underwriting standards stated in the registration statements pursuant to which they made offerings, including the prospectuses and prospectus supplements that formed part of those registration statements.

76.     As set forth in detail below, numerous other facts confirm that the Underwriter Defendants failed to perform adequate due diligence when underwriting securitizations of mortgage-backed securities, because each was engaged in a push to expand its role in the mortgage-backed securities market.

### 1.     UBS

77.     UBS was negligent in allowing into its securitizations a substantial number of mortgage loans that, as reported to it by third-party due diligence firms, did not conform to the underwriting standards stated in the registration statements pursuant to which it made offerings, including the prospectuses and prospectus supplements that formed part of those registration statements.  Clayton's trending reports revealed that, in the period from the first quarter of 2006

24

to the second quarter of 2007, 20 percent of the mortgage loans UBS submitted to Clayton to review in residential mortgage-backed securities groups were rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 33 percent of the loans were subsequently waived in by UBS without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  *See* Clayton Trending Reports, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents.

78.     According to news reports, on December 24, 2007, Swiss regulators announced that the Swiss banking department charged with oversight of Swiss investment banks would be initiating a full investigation into how UBS AG, the ultimate corporate parent of UBS, incurred massive losses in connection with the subprime markets in the United States, resulting in it taking a $10 billion write-down in its mortgage backed investments.[5]

79.     On January 30, 2008, UBS AG pre-announced its fourth-quarter 2007 and full-year 2007 results, disclosing an additional $4 billion in write-downs in positions related to the U.S. residential mortgage market.  *See* UBS Pre-Announcement (Jan. 30, 2008), *available at* http://www.sec.gov/Archives/edgar/data/1114446/000095012308000940/y47689e6vk.htm.

80.     In April 2008, UBS AG presented Swiss banking regulators with a report detailing the reasons for its massive losses related to the U.S. subprime mortgage market.  In that report, UBS AG admitted that its losses in the U.S. subprime mortgage market were due to a litany of errors, including inadequate risk management and a focus on revenue growth, which

---

[5]   *See, e.g.*, Paul Verschuur, *Swiss Regulator to See What Caused Subprime Loss* (Dec. 24, 2007), Bloomberg News, *available at* http://www.bloomberg.com/apps/news?pid= newsarchive&sid=aD6AJy16qjgg.

contributed to the weaknesses in its substantial subprime portfolio.  The report is available at

http://www.static-ubs.com/global/en/about_ubs/investor_relations/share_information/

shareholderreport/_jcr_content/par/linklist_0/link_1.1304036023.file/bGluay9wYXRoPS9jb250

ZW50L2RhbS91YnMvMnMvL2xvY2FsL2Fib3V0X3Vicy9pbnZlc3Rvcl9yZWxhdGlvbnMvMTQwwM

zMzXzA4MDQxOFNoYXJlaG9sZGVyUmVwb3J0LnBkZg==/140333_080418ShareholderRep

ort.pdf.

## 2.    Bear Stearns (now JP Morgan Securities)

81.     Bear Stearns was negligent in allowing into its securitizations a substantial

number of mortgage loans that, as reported to it by third-party due diligence firms, did not

conform to the underwriting standards stated in the registration statements pursuant to which it

made offerings, including the prospectuses and prospectus supplements that formed part of those

registration statements.  Clayton's trending reports revealed that, in the period from the first

quarter of 2006 to the second quarter of 2007, 16 percent of the mortgage loans Bear Stearns

submitted to Clayton to review in residential mortgage-backed securities groups were rejected by

Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that

Clayton found defective, 42 percent of the loans were subsequently waived in by Bear Stearns

without proper consideration and analysis of compensating factors and included in

securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  *See*

Clayton Trending Reports, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-

impact-of-the-financial-crisis-sacramento#documents.

82.     In connection with a civil case brought against Bear Stearns' affiliate EMC

Mortgage Corporation in its capacity as a sponsor, *Ambac Assurance Corp. v. EMC Mortgage

Corp.*, No. 08 Civ. 9464 (RMB) (THK) (S.D.N.Y., filed Nov. 5, 2008), certain previously

internal documents were made public in 2010.  Internal Bear Stearns communications

demonstrate that the third-party due diligence process was failing.  Jeffrey Verschleiser, who at the time was a Senior Managing Director at Bear Stearns, in e-mails to another Senior Managing Director, stated in 2006 that "[w]e are wasting too much money on Bad Due Diligence" and that "[w]e are just burning money hiring [third-party due diligence firms]."

83.     Similarly, starting in April 2005, the former head of Bear Stearns' due diligence department, John Mongelluzzo, repeatedly implored the co-heads of the mortgage finance department, Mary Haggerty and Baron Silverstein, to revise the due diligence protocols of Bear Stearns' affiliate, EMC Mortgage Corporation.  Recognizing that the existing protocols allowed for the purchase and securitization of defective loans, Mr. Mongelluzzo proposed to rank loans slotted for due diligence by risk criteria, and apply incremental resources to the review of each successive gradation of loan.  But Ms. Haggerty and Mr. Silverstein rejected this proposal.

84.     Other documents recently made public in the EMC Mortgage litigation revealed that, around May 2005, Ms. Haggerty and Mr. Silverstein had also rejected Mr. Mongelluzzo's proposal to "track loans that are overridden by our due diligence managers and track the performance of those loans."

85.     Further demonstrating problems within Bear Stearns' due diligence processes is the recent revelation that, by 2006, the accrued number of non-compliant loans purchased by the Bear Stearns affiliate EMC Mortgage Corporation was so high that its quality control and claims departments were overwhelmed by the sheer volume of repurchase claims that needed to be processed.  A recently publicized February 28, 2006 internal audit report identified a "significant backlog for collecting from and submitting" 9,000 outstanding repurchase claims to sellers, worth over $720 million.  The report went on to conclude that the procedures in place were insufficient to process, resolve, and monitor so many claims.

86.     Other internal communications further confirm that the Bear Stearns enterprise was securitizing large numbers of defective loans amid a breakdown in its due diligence processes.  In a March 2006 email only recently made public, Bear Stearns Vice President Robert Durden admitted:  "I agree the flow loans were not flagged appropriately and we securitized many of them which are still to this day not cleared.  I think the ball was dropped big time on the flow processes involved in the post close [due diligence], from start to finish."

### 3.     Credit Suisse

87.     Credit Suisse touted that, by 2007, it had become a major arranger and marketer of residential mortgage-backed securities.  It prominently displays on its website an award by Tradeweb, naming Credit Suisse the "#1 MBS Dealer overall for 2007, 2008, 2009, and 2010.  *See* https://www.credit-suisse.com/investment_banking/fixed_income/en/structured_ products.jsp.  Credit Suisse further stated in its 2009 Annual Report (at 27) that it was "[r]anked number one by Tradeweb in RMBS pass-through trading, with 19% market share for 2009."  The report is available at https://www.credit-suisse.com/investors/doc/ar09/csg_ar_2009_en.pdf.

88.     When the securitization machine stopped, Credit Suisse was forced to take massive write-downs on its books.  On February 19, 2008, Credit Suisse announced write-downs of $2.8 billion in positions related to mortgage-backed securities and collateralized debt obligations.  *See* Chris Hughes and Paul J. Davies, *Credit Suisse Shocks With $2.8bn Mark-Down* (Feb. 19, 2008), *at* http://www.ft.com/intl/cms/s/0/34cdcea8-dec4-11dc-91d4-0000779fd2ac.html#axzz1xVnw8xfz.

89.     According to news reports, the SEC has subpoenaed Credit Suisse Group AG, seeking documents relating to securitized home loans.  *See, e.g.*, Jody Shenn and Shannon D. Harrington, *SEC Subpoenas Credit Suisse Over Mortgages, MBIA Says* (May 5, 2011), *at*

http://www.bloomberg.com/news/2011-05-05/sec-subpoenas-credit-suisse-over-mortgages-mbia-says-in-n-y-court-filing.html.

90.     MBIA Insurance Corp. ("MBIA"), which provided insurance coverage for some of Credit Suisse's securitizations, has filed suit alleging that Credit Suisse, in seeking financial guaranty insurance for its securitizations, misrepresented the quality of the underlying mortgage loans.  *See MBIA v. Credit Suisse Sec.*, No. 603751/2009 (N.Y. Sup. Ct. Dec. 14, 2009).  As discussed in its complaint, MBIA, which gained access to the loan origination files, found that over 80 percent of the loans in the pools underlying securitizations sponsored and underwritten by Credit Suisse entities were not originated in compliance with the applicable underwriting guidelines.  In a suit brought by another monoline insurer against Credit Suisse, *Ambac v. DLJ Mortgage Capital et al.*, No. 600070/2010 (N.Y. Sup. Ct. Jan. 22, 2010)*,* Ambac, in its complaint, quoted specific documents produced by Credit Suisse demonstrating that when faced with alarming early payment default rates on loans that it planned to securitize, Credit Suisse employees sought "quality control" reports.  Those reports showed that substantial percentages of the delinquencies had been caused by substandard underwriting, misstated incomes, and undisclosed debts.

91.     Credit Suisse was negligent in allowing into its securitizations a substantial number of mortgage loans that, as reported to it by third-party due diligence firms, did not conform to the underwriting standards stated in the registration statements pursuant to which it made offerings, including the prospectuses and prospectus supplements that formed part of those registration statements.  Clayton's trending reports revealed that, in the period from the first quarter of 2006 to the second quarter of 2007, 32 percent of the mortgage loans Credit Suisse submitted to Clayton to review in residential mortgage-backed securities groups were rejected by

Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage loans that Clayton found defective, 33 percent of the loans were subsequently waived in by Credit Suisse without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  *See* Clayton Trending Reports, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento.

92.    Recently, on May 18, 2012, the Federal Deposit Insurance Corporation ("FDIC"), as receiver for two Illinois banks, filed a complaint against numerous defendants, including Credit Suisse, for making untrue or misleading statements and omissions in connection with the issuance and sale of residential mortgage-backed securities.  *See* Compl., *FDIC v. Bear Stearns Asset Backed Securities I LLC et al*, No. 12 CV 4000 (S.D.N.Y. May 18, 2012) ("FDIC Complaint").  The untrue or misleading statements and omissions relate to "material facts as the loan-to-value ratios of the mortgage loans, the extent to which appraisals of the properties that secured the loans were performed in compliance with professional appraisal standards, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own [underwriting] standards in doing so."  FDIC Complaint at ¶ 1.

93.    In two securitizations in which Credit Suisse had served as the underwriter, the FDIC alleges based on a review of randomly sampled loans that Credit Suisse made materially untrue or misleading statements regarding 61.7% and 56.7% of the loans in those respective securitizations.  *See* FDIC Complaint at ¶ 2; Schedule 7; Schedule 10.  The findings of the FDIC as to materially untrue and misleading statements made by Credit Suisse in connection with the

issuance and sale of residential mortgage-backed securities further corroborate FHFA's analysis

of the Securitizations, as described *infra* at paragraphs 132 to 168.

### 4. Merrill Lynch

94.     From approximately 2004, Merrill Lynch made it its mission to increase its share

of the mortgage-backed securities market.  In his book, David Faber describes Merrill Lynch's

focus on mortgage-backed securities in the heyday of this business:

> As Merrill headed into 2007, it had . . . a mission to get even bigger in the one
> area that had been so instrumental to all its success:  mortgages.  It wanted to
> originate more mortgages, buy more mortgages, package more mortgages into
> securities, and package more of those securities into [collateralized debt
> obligations].  And of course, it wanted to sell those securities and CDOs as fast as
> it possibly could, because that's where the money was . . . .

David Faber, *And Then The Roof Caved In:  How Wall Street's Greed and Stupidity Brought*

*Capitalism to its Knees* 131 (Wiley 2009).

95.     In its quest to increase its market share, Merrill Lynch faced fierce competition

from an increasing number of market players. The push to securitize large volumes of mortgage

loans contributed to the absence of controls needed to ensure that the loans conformed to its

representations.  In particular, Merrill Lynch was negligent in allowing into its securitizations a

substantial number of mortgage loans that, as reported to it by third-party due diligence firms,

did not conform to the underwriting standards stated in the registration statements pursuant to

which it made offerings, including the prospectuses and prospectus supplements that formed part

of those registration statements.  Clayton's trending reports revealed that, in the period from the

first quarter of 2006 to the second quarter of 2007, 23 percent of the mortgage loans Merrill

Lynch submitted to Clayton to review in residential mortgage-backed securities groups were

rejected by Clayton as falling outside the applicable underwriting guidelines.  Of the mortgage

loans that Clayton found defective, 32 percent of the loans were subsequently waived in by

Merrill Lynch without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here.  *See* Clayton Trending Reports, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents.

96.     Within only a few short years, Merrill was one of the top underwriters of mortgage-backed securities.  As Faber explains, Merrill Lynch's Chief Executive Officer, Stanley O'Neal, "had increased profitability by having Merrill Lynch take on more and more risk.  The company dove headlong into a mortgage market that was poised to collapse."  *And Then the Roof Caved In*, at 133.  This level of risk gave Merrill Lynch a huge incentive to securitize mortgage loans and offload mortgage-backed securities as quickly as it could, without conducting adequate due diligence.

97.     Merrill Lynch's underwriting and due diligence practices with respect to mortgage-backed securities are currently being investigated by the SEC.  In October 2007, the SEC launched an informal investigation into Merrill Lynch's underwriting of mortgage-backed securities.  *See, e.g.*, Associated Press, *Merrill Lynch Acknowledges SEC Investigation* (Nov. 7, 2007), *at* http://www.msnbc.msn.com/id/21680312/ns/business-us_business/t/merrill-lynch-acknowledges-sec-investigation/#.TkDMnmEniSo.  That investigation was upgraded to a formal inquiry in early 2008.  *See, e.g.*, Amir Efrati, Susan Pulliam, Kara Scannel and Craig Karmin, *Prosecutors Widen Probes Into Subprime—U.S. Attorney's Office Seeks Merrill Material; SEC Upgrades Inquiry*, Wall St. J., Feb. 8, 2008.

C.      **Additional Allegations Regarding the Liability of JP Morgan Securities as Successor to Bear Stearns**

98.     On March 16, 2008, Bear Stearns' parent company, The Bear Stearns Companies Inc., entered into an Agreement and Plan of Merger with JPMorgan Chase for the purpose of consummating a "strategic business combination transaction" between the two entities.

99.     It was pursuant to this Agreement that, as described *supra* at paragraph 20, The Bear Stearns Companies Inc. merged with Bear Stearns Merger Corporation, a wholly owned subsidiary of JPMorgan Chase, making The Bear Stearns Companies Inc. a wholly owned subsidiary of JPMorgan Chase.  As such, upon the May 30, 2008 effective date of the merger, JPMorgan Chase became the ultimate corporate parent of The Bear Stearns Companies Inc.'s subsidiaries, including Bear Stearns.

100.    According to *The New York Times* in an article published on April 6, 2008, JPMorgan took immediate control of The Bear Stearns Companies Inc.'s business and personnel decisions.  The article cited an internal JPMorgan memo, revealing that "JPMorgan Chase, which is taking over the rival investment bank Bear Stearns, will dominate the management ranks of the combined investment banking and trading businesses."  It was planned that of the 26 executive positions in the newly merged investment banking and trading division, only five would be drawn from Bear Stearns.

101.    In a June 30, 2008 press release describing internal restructuring to be undertaken pursuant to the merger, JPMorgan stated its intent to assume Bear Stearns and its debts, liabilities, and obligations as follows:

> Following completion of this transaction, Bear Stearns plans to transfer its broker-dealer subsidiary Bear, Stearns & Co. Inc. to JPMorgan Chase, resulting in a transfer of substantially all of Bear Stearns' assets to JPMorgan Chase.  In connection with such transfer, JPMorgan Chase will assume (1) all of Bear Stearns' then-outstanding registered U.S. debt securities; (2) Bear Stearns' obligations relating to trust preferred securities; (3) Bear Stearns' then-

outstanding foreign debt securities; and (4) Bear Stearns' guarantees of then-outstanding foreign debt securities issued by subsidiaries of Bear Stearns, in each case, in accordance with the agreements and indentures governing these securities.

102.    Bear Stearns & Co., Inc. subsequently merged with J.P. Morgan Securities Inc. and is now doing business as J.P. Morgan Securities Inc.  JPMorgan's 2008 Annual Report described the transaction as a merger, stating that "[o]n October 1, 2008, J.P. Morgan Securities Inc. merged with and into Bear, Stearns & Co. Inc., and the surviving entity changed its name to J.P. Morgan Securities Inc."

103.    Further, the former Bear Stearns website, www.bearstearns.com, redirects Bear Stearns visitors to J.P. Morgan Securities Inc.'s website.

104.    J.P. Morgan Securities Inc. was fully aware of the pending and potential claims against Bear Stearns when it consummated the merger.  J.P. Morgan Securities Inc. has further evinced its intent to assume Bear Stearns' liabilities by paying to defend and settle lawsuits brought against Bear Stearns.

105.    J.P. Morgan Securities Inc. later announced its intention to "convert to a limited liability company, effective September 1, 2010," as part of which it changed its name to J.P. Morgan Securities LLC.

106.    As a result of the merger, Defendant JP Morgan Securities is the successor-in-interest to Bear Stearns, and is jointly and severally liable for the misstatements and omissions of material fact alleged herein of Bear Stearns & Co., Inc.  This action is brought against JP Morgan Securities as successor to Bear Stearns.

III.   **THE STATEMENTS IN THE REGISTRATION STATEMENTS**

A.   **Compliance With Underwriting Guidelines**

107.   The Prospectus and Prospectus Supplement for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the related Securitizations were supposed to have been originated.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.  As explained below, a reasonable investor would not have understood, in light of the representations regarding supposed adherence to underwriting guidelines, that there were pervasive and systematic breaches of those guidelines with respect to the securitized loans.

108.   The statements about compliance with underwriting guidelines made in the Prospectus and Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's, including the GSEs', decision to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in a greater economic risk to an investor.

109.   The Prospectuses and Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of First Horizon Home Loan, which originated or acquired the loans in the Securitizations.  For example, the Prospectus Supplements represented that the underlying mortgage loans were underwritten in accordance with First Horizon Home Loan's "Super Expanded Underwriting Guidelines" (the "Guidelines"). Though those Guidelines were "less restrictive" than First Horizon Home Loan's standard guidelines, the Prospectuses—to which the Prospectus Supplements referred—confirmed that

they "generally include a set of specific criteria pursuant to which the underwriting evaluation is made," and which are "intended to evaluate the prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed property as collateral."

110.   The Prospectuses stated that "exceptions" could be made to the Guidelines, on a case-by-case basis, only where compensating factors exist and if the mortgage loan was in substantial compliance with the underwriting standards:

> [A] mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan substantially complies with the underwriting standards.  For example, a mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, *if other factors compensated for the criteria that were not satisfied* or if the mortgage loan is considered to be in substantial compliance with the underwriting standards.

(Emphasis added).

111.   With respect to the information evaluated by First Horizon Home Loan in deciding whether to give a loan, each Prospectus represented that:  "In the loan application process, prospective mortgagors will be required to provide information regarding such factors as their assets, liabilities[,] income, credit history, employment history, and other related items. Each prospective mortgagor will also provide an authorization to apply for a credit report which summarizes the mortgagor's credit history."  First Horizon similarly pledged in each Prospectus that it would "require evidence regarding the mortgagor's employment and income, and of the amount of deposits made to financial institutions where the mortgagor maintains demand or savings accounts."

112.   Additionally, each Prospectus claimed that, "First Horizon's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac except for maximum loan size."  The Prospectus for FHAMS 2006-AA1 further warranted that "[a]ll

36

appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation."  Each Prospectus stated, "In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed.  The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property."  The Prospectuses further represented that "[t]he value of the Property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance."

113.    The Prospectuses also stated that, even when the loans were not originated by First Horizon, a review may have been conducted by First Horizon itself—depending on "factors relating to the experience of the seller, characteristics of the specific mortgage loan, including the principal loan balance, the Loan-to-Value Ratio, the loan type or loan program, and the applicable credit score of the related mortgagor used in connection with the origination of the mortgage loan, as determined based on a credit scoring model acceptable to First Horizon."

114.    The Prospectus and Prospectus Supplement for each of the Securitizations had similar representations to those quoted above  As discussed *infra* at paragraphs 132 to 168, in fact the originators of the mortgage loans in the Supporting Loan Groups for the Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

115.    Further, the Prospectuses described additional representations and warranties concerning the mortgage loans backing the Securitizations that were made by the seller,

including that all of the mortgage loans in the mortgage pool complied in all material respects with all applicable local, state, and federal laws at the time of origination.

116.     The inclusion of these representations in the Prospectuses and Prospectus Supplements had the purpose and effect of providing additional assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations and the compliance of that collateral with the underwriting guidelines described in the Prospectuses and Prospectus Supplements.  These representations were material to a reasonable investor's, including the GSEs', decision to purchase the Certificates.

### B.     Statements Regarding Occupancy Status of Borrowers

117.     The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations.  Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property.  The Prospectus Supplement for each Securitization presented this information in tabular form in a table entitled "Occupancy Types for the Mortgage Loans."  This table divided all the loans in the collateral group into categories reflecting occupancy status:  (i) "Primary Residence," (ii) "Second Residence," and (iii) "Investor Property."

118.     For each category, the table stated the number of loans in that category. Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[6]

---

[6]   Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner occupied, investor, and second home.  These numbers have been converted to percentages.

**Table 4**

| Transaction | Supporting Loan Group | Primary Residence (%) | Second Residence (%) | Investor Property (%) |
|---|---|---|---|---|
| FHAMS 2005-AA9 | Group 2 | 53.69 | 7.70 | 38.60 |
| FHAMS 2005-AA10 | Group 1 | 49.94 | 9.11 | 40.95 |
| FHAMS 2005-AA11 | Group 1 | 51.50 | 6.15 | 42.35 |
| FHAMS 2005-AA12 | Group 2 | 60.88 | 5.28 | 33.84 |
| FHAMS 2006-AA1 | Group 1 | 46.25 | 7.89 | 45.86 |

119.    As Table 4 makes clear, the Prospectus Supplement for each Securitization reported that a significant percentage of the mortgage loans in the Supporting Loan Groups were owner occupied.  Indeed, in three of the Securitizations, the Prospectus Supplement represented that the majority of loans in the Supporting Loan Groups were owner occupied.

120.    The statements about occupancy status were material to a reasonable investor's, including the GSEs', decision to invest in the Certificates.  Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan, and therefore, the securities that it collateralizes.  Because borrowers who reside in mortgaged properties are less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, and are more likely to care for their primary residence, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

121.    All other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders.  Even small differences in the percentages of owner-occupied, second home, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.  As discussed *infra* at paragraphs 133 to 137, the Registration

Statement for the Securitizations materially overstated the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting and understating the degree of risk of the GSE Certificates.

### C.   Statements Regarding Loan-to-Value Ratios

122.   The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

123.   The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced or home-equity loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

124.   The Prospectus Supplement for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole.  The percentage of loans by aggregate principal balance with an LTV ratio at or less than 80 percent, and the percentage of loans with an LTV ratio greater than 95 percent as reported in the Prospectus Supplements for the Supporting Loan Groups are reflected in Table 5 below.

**Table 5**

| Transaction | Supporting Loan Group | Percentage of Loans, By Aggregate Principal Balance, With LTV Ratios Less than or Equal to 80% | Percentage of Loans, By Aggregate Principal Balance, With LTV Ratios Greater than 95% |
|---|---|---|---|
| FHAMS 2005-AA9 | Group 2 | 97.76 | 0.00 |
| FHAMS 2005-AA10 | Group 1 | 97.22 | 0.00 |
| FHAMS 2005-AA11 | Group 1 | 98.27 | 0.00 |
| FHAMS 2005-AA12 | Group 2 | 98.26 | 0.00 |

| FHAMS 2006-AA1 | Group 1 | 97.64 | 0.00 |

125.    As Table 5 makes clear, the Prospectus Supplement for each Securitization reported that the vast majority of the mortgage loans in the Supporting Loan Groups had LTV ratios of 80 percent or less, and *zero* mortgage loans in the Supporting Loan Groups had LTV ratios over 95 percent.

126.    The LTV ratio is among the most important measures of the risk of a mortgage loan, and thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates.  The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property.  This ratio also predicts the severity of loss in the event of default.  The lower the LTV ratio, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

127.    Thus, the LTV ratio is a material consideration to a reasonable investor, including the GSEs, in deciding whether to purchase a certificate in a securitization of mortgage loans. The 80 percent threshold is particularly relevant to a reasonable investor given that prudent lenders traditionally require borrowers to pay 20 percent of the value of the property in the absence of a mortgage insurance policy, and thus only lend 80 percent of the value of the property.  Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate.  As discussed at paragraphs 138 to 143 *infra*, the Registration Statement for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less

than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 95 percent, thereby misrepresenting and understating the degree of risk of the GSE Certificates.

### D.     Statements Regarding Credit Ratings

128.     Credit ratings are assigned to the tranches of mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings.  Each credit rating agency uses its own scale with letter designations to describe various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  C and D ratings or their equivalents are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery.  At the time the GSEs purchased the GSE Certificates, investments with AAA or its equivalent ratings historically experienced loss rates of less than 0.05 percent. Investments with a BBB rating, or its equivalent, historically experienced loss rates of under one percent.  As a result, securities with credit ratings between AAA through BBB- or their equivalents were generally referred to as "investment grade."

129.     Rating agencies determine the credit rating for each tranche of a mortgage-backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors.  Rating agencies determine the likelihood of repayment by estimating cashflows based on the quality of the underlying mortgages by using sponsor-provided loan-level data.  Credit enhancements, such as subordination, represent the amount of "cushion" or protection from loss incorporated into a given securitization.[7]  This

---

[7]   "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become

42

cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled.  The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral group and the entire securitization.  Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificate holders.  If the collateral within the deal is of a higher quality, then rating agencies require less credit enhancement for AAA or its equivalent rating.

130.    Credit ratings have been an important tool to gauge risk when making investment decisions.  For almost a hundred years, investors like pension funds, municipalities, insurance companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments.  Fannie Mae and Freddie Mac's respective internal policies limited their purchases of private label residential mortgage-backed securities to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).

131.    Each tranche of the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche.  Defendants reported the credit ratings for each tranche in the Prospectus Supplements.  The credit rating provided for each of the GSE Certificates was "investment grade," always "AAA" or its equivalent.  The accuracy of these ratings was material to a reasonable investor's, including the GSEs', decision to purchase the Certificates.  As set forth in Table 8, *infra*, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying

---

delinquent or default, the junior certificates suffer losses first.  These subordinate certificates thus provide a degree of protection to the senior certificates from losses on the underlying loans.

mortgage collateral to the ratings agencies, and, as a result, Defendants marketed and sold the

GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

## IV.     FALSITY OF STATEMENTS IN THE PROSPECTUS SUPPLEMENTS

### A.     The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False or Misleading

132.     A review of loan-level data for a sample of mortgage loans in each Securitization

was conducted in order to assess whether the statistical information provided in the Prospectus

Supplements was true and accurate.  For each Securitization, the sample consisted of 1,000

randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were

fewer than 1,000 loans in the Supporting Loan Group.  The sample data confirms, on a

statistically significant basis, material misrepresentations of underwriting standards and of

certain key characteristics of the mortgage loans across the Securitizations at the time of their

origination.  The data review further demonstrates that the data concerning owner occupancy and

LTV ratios was materially false and misleading at the time of their origination.

#### 1.     Owner-Occupancy Data Was Materially False

133.     The data review reveals that the owner-occupancy statistics reported in the

Prospectus Supplements were materially false and inflated at the time of the loans' origination.

In fact, far fewer underlying properties were occupied by their owners than disclosed in the

Prospectus Supplements, and more correspondingly were held as second homes or investment

properties.

134.     To determine whether a given borrower actually occupied the property as

claimed, tests were conducted during Plaintiff's data review, including, *inter alia*, whether, the

borrower's tax bill was being mailed to the mortgaged property or to a different address six

months after the loan closed; whether the borrower had claimed a tax exemption for being an

owner occupying the mortgaged property; and whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records.  Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much less likely the borrower will repay the loan.

135.    A significant number of the loans failed two or more of these tests, indicating that the owner-occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading.  For example, for the FHAMS 2005-AA10 Securitization, for which First Horizon Home Loan was the sponsor and FTN was the lead underwriter, the Prospectus Supplement stated that 50.06 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied, and therefore 49.94 percent were owner-occupied.  But the data review revealed that 13.87 percent of the properties represented as owner-occupied in the sample showed strong indications that their owners lived elsewhere.  Taking into account that an additional 13.87 percent of the 49.94 percent of loans represented as owner-occupied in the Supporting Loan Group were in fact not owner-occupied, the true percentage of non-owner-occupied properties was 56.99 percent, a significantly higher percentage than was reported in the Prospectus Supplement.

136.    The data review revealed that, for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner-occupied properties.  The true percentage of non-owner-occupied properties, as determined by the data review, versus the percentage stated in the Prospectus Supplements for each Securitization, is reflected in Table 6 below.

**Table 6**

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner-Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner-Occupancy[8] | Actual Percentage of Non-Owner-Occupied Properties | Prospectus Percentage Understatement of Non-Owner-Occupied Properties |
|---|---|---|---|---|---|
| FHAMS 2005-AA9 | Group 2 | 46.31 | 12.50 | 53.02 | 6.71 |
| FHAMS 2005-AA10 | Group 1 | 50.06 | 13.87 | 56.99 | 6.93 |
| FHAMS 2005-AA11 | Group 1 | 48.50 | 14.64 | 56.04 | 7.54 |
| FHAMS 2005-AA12 | Group 2 | 39.12 | 14.18 | 47.75 | 8.63 |
| FHAMS 2006-AA1 | Group 1 | 53.75 | 13.43 | 59.96 | 6.21 |

137.     The GSEs understood that Defendants had determined that the statistics provided in the Prospectus Supplements were true and correct in all material respects.  In reality, as Table 6 reflects, the Prospectus Supplement for each Securitization was materially inaccurate, understating the percentage of non-owner occupied properties by at least six percent, and thus materially understating the risk of the GSE Certificates.  The Prospectus Supplements containing the owner-occupancy statistics bore Defendants' names, and Defendants were endorsing the statistics in these documents.

### 2.     LTV Data Was Materially False

138.     The data review further reveals that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated at the time of the loans' origination, as more specifically set out below.  For each of the sampled loans, an industry-standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was originated.  Such AVMs are routinely used in the industry as a way of

---

[8]     As described more fully in paragraph 134, failing two or more tests of owner occupancy is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property.

valuing properties during prequalification, origination, portfolio review and servicing.  AVMs rely upon similar data as appraisers—primarily, county assessor records, tax rolls, and data on comparable properties.  Retroactive AVMs may be used to produce independent, statistically derived valuation estimates at the time of the loan's origination by applying modeling techniques to this data.  The ValuePoint4 ("VP4") AVM was used to analyze the data via appraisal emulation, repeat sales indexes, and regression analysis, relying only on sales made within the 24 months prior to the origination of the mortgage loan at issue.

139.    Applying the VP4 AVM to the available data for the properties securing the sampled loans shows that the appraised values given to such properties at the time of origination were significantly higher than the actual values of such properties at the time they were originated.  The result of this overstatement of property values is a material understatement of the LTV ratios.  That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value.  This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default.

140.    For the FHAMS 2005-AA10 Securitization, for example, which was sponsored by First Horizon Home Loan and underwritten by FTN, the Prospectus Supplement stated that no mortgage loan had an LTV ratio above 95 percent.  In fact, 10.69 percent of the sample of loans included in the data review, based on total principal balance, had LTV ratios above 95 percent. In addition, the Prospectus Supplement stated that 97.76 percent of the loans had LTV ratios at or below 80 percent.  The data review indicated that only 60.44 percent of the loans had LTV ratios at or below 80 percent.

141.    The data review revealed that for each Securitization, the Prospectus Supplement misstated several key statistics, including (i) the percentage of loans that had LTV ratios above 95 percent, at the time of their origination, and (ii) the percentage of loans that had LTV ratios at or below 80 percent, at the time of their origination.  Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group at the time of origination with LTV ratios above 95 percent, versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in the Supporting Loan Group at the time of origination with LTV ratios at or below 80 percent, versus the percentage reported in the Prospectus Supplement.  The percentages listed in Table 7 were calculated by aggregate principal balance.

**Table 7**

| Transaction | Supporting Loan Group | PROSPECTUS<br><br>Percentage of Loans Reported to Have LTV Ratios At or Less than 80% | DATA REVIEW<br><br>True Percentage of Loans With LTV Ratios At or Less than 80% | PROSPECTUS<br><br>Percentage of Loans Reported to Have LTV Ratios Over 95% | DATA REVIEW<br><br>Percentage of Loans With LTV Ratios Over 95% |
|---|---|---|---|---|---|
| FHAMS 2005-AA9 | Group 2 | 97.76 | 60.44 | 0.00 | 7.29 |
| FHAMS 2005-AA10 | Group 1 | 97.22 | 60.62 | 0.00 | 10.69 |
| FHAMS 2005-AA11 | Group 1 | 98.27 | 61.85 | 0.00 | 8.54 |
| FHAMS 2005-AA12 | Group 2 | 98.26 | 62.10 | 0.00 | 7.87 |
| FHAMS 2006-AA1 | Group 1 | 97.64 | 66.27 | 0.00 | 9.93 |

142.    As Table 7 demonstrates, the Prospectus Supplements for the Securitizations reported that *none* of the mortgage loans in the Supporting Loan Groups had LTV ratios over 95 percent.  In contrast, the data review revealed that at least seven percent of the mortgage loans for each Securitization had LTV ratios over 95 percent.

48

143.    These systematic inaccuracies with respect to reported LTV ratios also indicate that the representations and warranties in the Registration Statement relating to appraisal practices were false, and that the appraisers themselves routinely furnished appraisals that the appraisers understood were inaccurate and knew bore no reasonable relationship to the actual value of the underlying properties.  Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that, as demonstrated by Table 7, deviate so significantly (and so consistently upward) from the true values of the appraised properties.  These consistent errors demonstrate that, contrary to the representations in the Prospectus and Prospectus Supplements, the appraisers did not comply with the Uniform Standards of Professional Appraisal Practice but instead generated inflated appraisal values merely to justify the issuance of a mortgage loan.  This conclusion is further confirmed by the findings of the FCIC, which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results.  *See* FCIC, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (2011).

**B.    The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines**

144.    The Registration Statement contained material misstatements and omissions regarding compliance with applicable underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their respective mortgage lending businesses.  This is confirmed by the systematically misreported owner-occupancy and LTV statistics, discussed above, and by (1) admissions of First Horizon and allegations made in

49

other suits and regulatory actions that have revealed First Horizon's widespread abandonment of reported underwriting guidelines during the relevant period; (2) the collapse of the GSE Certificates' credit ratings; and (3) the surge in delinquencies and defaults in the mortgages in the Securitizations.

### 1. First Horizon Home Loan Failed To Adhere to Its Underwriting Guidelines

#### (a) Government Reports and Other Evidence Have Confirmed that First Horizon Home Loan Failed To Adhere to Its Underwriting Guidelines

145.    First Horizon's abandonment of underwriting guidelines is confirmed by government reporting, lawsuits, and other sources that have described rampant underwriting failures by First Horizon throughout the period of the Securitizations.

146.    On May 9, 2008, a group of plaintiffs filed a class action suit against First Horizon National, First Tennessee, and Individual Defendants Baker, Makowiecki and Burkett, among others, for ERISA violations based on their investment of employee retirement plans in First Horizon National's own stock. *See Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293 (W.D. Tenn. May 9, 2008). The plaintiffs claimed that First Horizon required plan participants to invest in the company's stock, which was imprudent because First Horizon was lowering its underwriting standards, and increasing its use of off-balance sheet transactions. In their Third Amended Complaint, the plaintiffs alleged:

- First Horizon's "national expansion strategy" consisted primarily of opening offices around the country, while failing to create an appropriate credit review structure, audit and accounting infrastructure to provide adequate oversight for the greatly increased production. First Horizon placed insufficient emphasis on such functions as internal audit and accounting and governmental compliance, while pouring resources into production.

- As of the beginning of 2006, First Horizon's real estate valuation processes did not comply with regulatory guidance. While this significant

problem was the subject of numerous regulatory examinations and communications, the flaws in First Horizon's processes were so serious that the company failed to attain compliance with applicable regulatory guidance during 2006 into 2007.  Internal reporting cited the fact that First Horizon did not have accurate locations recorded for all real estate collateral, and was unable to keep up with the identification of problem assets in the residential commercial real estate portfolio, which delayed timely recognition of losses and appropriate provisioning. The appraisal processes also had serious flaws which caused significant problems in the valuation of real estate.

- First Horizon's compensation practices and staffing favored short-term product growth over proper risk management.  As of January 1, 2006, compensation was not aligned with the prudent management of the institution and its risks.  Product sales staff were hired without regard to whether First Horizon had sufficient management to oversee, account, and reserve for the risks of such sales.

- Once First Horizon began to use more appropriate methodologies and data analytics in internal auditing, audit reporting described significant problems and issued "unsatisfactory" ratings, including in the processes, procedures, and controls used in consumer appraisal ordering, compliance with loan collateral requirements, and customer/credit risk due diligence for certain products, among other matters.

147.    On September 30, 2009, the District Court for the Western District of Tennessee denied in part the defendants' motions to dismiss the plaintiffs' claims, holding that the plaintiffs had adequately pleaded that the defendants breached their fiduciary duties to the plaintiffs by investing in First Horizon stock when it was no longer prudent to do so.  *See generally Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293, 2009 WL 3241689 (W.D. Tenn. Sept. 30, 2009).  On October 10, 2010, the Court confirmed that order, denying the defendants' request for reconsideration.  First Horizon reached a tentative $6 million settlement with the plaintiffs in November 2011, which was preliminarily approved by the Court on May 16, 2012.

148.    Additionally, in June 2010, shareholders filed a derivative suit against Defendant First Horizon National and Individual Defendant Baker, also in federal court in the Western District of Tennessee, alleging that First Horizon National engaged in unlawful origination

activities, falsified loan documents, concealed internal wrongdoing, failed to disclose the true

risks and losses of its origination activities, and failed to implement and follow controls designed

to minimize risk and loss. *See Reid v. First Horizon Nat'l, et al.,* No. 10-cv-02413 (W.D. Tenn.

2010). Although the complaint was dismissed on statute of limitations grounds, its allegations

corroborate FHFA's claim here that First Horizon systematically failed to adhere to its

underwriting guidelines.

149. Administrative and regulatory proceedings have also brought to light fraudulent

underwriting practices at First Horizon Home Loan. In July 2008, a former First Horizon Home

Loan corporate security investigator filed a whistleblower complaint with the Department of

Labor alleging that the company routinely concealed mortgage and banking fraud prior to her

termination in 2006. *See* Marshall Eckblad, *Complaint Alleges First Horizon Concealed*

*Mortgage Fraud*, Dow Jones Newswires (July 2, 2008). The investigator stated that she had

uncovered over 50 separate cases of mortgage fraud during her time at First Horizon, including

fraudulent conduct at a First Horizon branch in Idaho. Examples of the perpetration of mortgage

fraud included:

- At one First Horizon branch in Idaho, a loan officer conceded that he had illegally altered loan documents, but told the investigator that "everyone in the branch is doing it."

- The same First Horizon branch routinely submitted applications for borrowers for adjustable-rate mortgages that officers knew the borrower could not afford. In order to accomplish this, First Horizon employees inflated the borrowers' income on applications for "stated income" loans – or subprime loans that did not require borrowers to substantiate their income – even though the loan officers were in possession of income tax documents that disproved the stated income.

- According to the investigator, First Horizon as a general rule "allowed the loan officers – as long as they were raking in the money – to do whatever they wanted." As an example, one top-producing loan officer fabricated and forged a lease agreement between an applicant and the

applicant's mother, without either one's knowledge, in order to qualify the applicant for a loan.

- First Horizon also covered up allegations of fraud by removing from internal draft "Suspicious Activity Reports" any references to fraud committed by its loan officers before those reports were provided to regulators.  Instead, First Horizon directed any allegations involving fraud toward the loan applicants themselves.

- When the investigator reported cases of loan fraud to her superiors at First Horizon, the supervisors "intervened or overrode" her investigations, or "took no action at all."

150.    Systemic lack of compliance with underwriting standards at First Horizon also has come to light as a result of a recent U.S. Department of Housing and Urban Development ("HUD")  investigation.  In January 2010, HUD Inspector General Kenneth M. Donohue subpoenaed First Tennessee regarding failed loans issued by First Horizon Home Loan that resulted in claims paid out by the Federal Housing Administration's ("FHA") mortgage insurance fund.  The HUD Inspector General sought to "aggressively pursue indicators of fraud" at First Horizon after FHA Commissioner David Stevens identified First Horizon as having "a significant number of claims, a certain loan underwriting volume, a high ratio of defaults and claims compared to the national average, and claims that occurred earlier in the life of the mortgage."  According to Stevens, First Horizon's data presented "key indicators of problems at the origination or underwriting stages."  *See* Eric Snyder, *First Tennessee Bank Mortgage Loan Records Subpoenaed*, The Nashville Business Journal (Jan. 13, 2010) (available at http://www.bizjournals.com/nashville/stories/2010/01/11/daily17.html).

151.    At the time of HUD's investigation, First Horizon's "compare ratio," *i.e.*, the percentage of loan defaults and claims on FHA's mortgage insurance fund, was "in excess of 200 percent of the national average as listed" in HUD's Neighborhood Watch underwriting review system.  *See* U.S. Department of Housing and Urban Development, Office of Inspector General,

Memorandum No. 2010-NY-1807, *First Tennessee Bank, N.A., Memphis, TN, Did Not Properly Underwrite a Selection of FHA Loans* (dated Sept. 27, 2010) (available at http://www.hud.gov/ offices/oig/reports/files/ig1021807.pdf).

152.    The report released by HUD on September 27, 2010, based on a review of 18 loans originated by First Horizon Home Loans, concluded that 28% of the loans were not written in accordance with HUD/FHA underwriting regulations and were not made to qualified borrowers.  Specific examples of underwriting deficiencies evident from HUD's review of the loan files included:  (1) excessive debt-to-income ratios without adequate compensating factors; (2) inadequate gift fund documentation or verification of receipt of gift funds; and (3) failure to verify or document whether borrowers met the minimum cash investment requirement.  The report recommended that HUD should "pursue remedies under the Program Fraud Civil Remedies Act" and/or civil money penalties as a result of these underwriting violations.  *See* U.S. Department of Housing and Urban Development, Office of Inspector General, Memorandum No. 2010-NY-1807, *First Tennessee Bank, N.A., Memphis, TN, Did Not Properly Underwrite a Selection of FHA Loans* (dated Sept. 27, 2010) (available at http://www.hud.gov/ offices/oig/reports/files/ig1021807.pdf).

153.    Other regulators have now focused their attention on First Horizon.  In January 2012, both the Federal Deposit Insurance Corporation and the Federal Home Loan Bank of San Francisco requested information on the loans underlying a total of 20 First Horizon securitizations from the years 2005 and 2006 due to significant concerns regarding underwriting irregularities at the company.  *See* First Horizon National Form 10-Q, dated May 8, 2012, at 35-36, *available at* http://www.sec.gov/Archives/edgar/data/36966/000119312512218524/ d340174d10q.htm.

154.    First Horizon's poor origination practices eventually caught up to the company, and many entities that purchased loans from First Horizon forced the company to buy them back. As stated in its 2008 Annual Report (available at http://ir.fhnc.com/annuals.cfm):  "In addition to the negative aspects of asset quality on FHN's [*i.e.*, First Horizon National] loan portfolio, increased repurchase and make-whole claims from agency and private purchasers of loans originated and subsequently sold by FHN hampered earnings as FHN recorded $148.5 million in charges for its obligations related to these assets."  In First Horizon's 2010 Annual Report (available at http://ir.fhnc.com/annuals.cfm), First Horizon admitted that it had "observed loss severities ranging between 50 percent and 60 percent of the principal balance of the repurchased loans and rescission rates between 30 and 40 percent of the repurchase and make-whole requests."

155.    First Horizon has recently begun suing the mortgage brokers and appraisers it utilized in an effort to recoup some of these losses.  First Horizon—acting as plaintiff in those lawsuits—admits to the very underwriting, appraisal, and owner-occupancy misrepresentations at the heart of this action.

156.    For example, in *First Horizon Home Loans v. Centerpiece Mortgage, LLC, et al.*, No. 2:11-cv-00995-JAT (D. Ariz., filed May 19, 2011), First Horizon brought suit against Centerpiece Mortgage and four appraisers after it was "required to purchase the subject properties from Fannie Mae due to the fact that the loans were based on incorrect income and/or employment information."  *See First Horizon v. Centerpiece* Complaint, Ex. 2 at 1.  According to First Horizon, "Centerpiece brokered certain loans based on incorrect income and/or employment information for thirty-two (32) real properties located in Maricopa, County, Arizona."  *First Horizon v. Centerpiece* Complaint at ¶ 14.  Similarly, "all of the properties were

55

consistently overvalued by the Defendant appraisers." *Id.* at ¶ 15.  As a result, loans securitized

by First Horizon "were based on incorrect income, employment information and/or

overvaluations." *Id.* at ¶ 17.

157.    Additionally, in *First Horizon Home Loans v. Security Mortgage Corp.*, No. 3:09-

cv-2182-B (N.D. Tex., filed November 16, 2009), First Horizon sought relief for fraud, breach of

contract, and negligent misrepresentation against another mortgage broker, Security Mortgage

Corporation ("SMC").  First Horizon's complaint alleged that, for a loan it ultimately approved

and funded based on information provided to it by SMC, the mortgage broker failed to reveal

that the loan applicant had "obtained four (4) mortgages totaling $590,000.00 prior to the loan

application submitted to First Horizon" and "ultimately used the 'second home' as a rental

property." *First Horizon v. Security Mortgage* Complaint at ¶ 10.  First Horizon contended that,

had it known the actual financial condition and occupancy status of the property, it "would not

have approved [the] application and would not have funded the loan." *Id.* at ¶ 11.  SMC never

responded to these allegations, and on November 9, 2010, the United States District Court for the

Northern District of Texas entered default judgment in favor of First Horizon in the amount of

$226,350.91 in damages, plus interest and costs.

          (b)    A Forensic Review of Loan Files Was Not Possible Because
                 Defendant First Tennessee Has Failed To Comply with Subpoenas
                 Issued by FHFA in 2010 Seeking Loan Files

158.    Additional information regarding the failure of First Horizon Home Loan (which

was merged into Defendant First Tennessee in 2007) to adhere to its underwriting guidelines

could be gleaned from a review of loan origination files relating to the loans in the Supporting

Loan Groups underlying the Certificates.  Plaintiff, however, has been unable to obtain such loan

files because Defendant First Tennessee has to date failed to comply with subpoenas issued by

FHFA to First Horizon Home Loan, nearly two years ago and has opposed enforcement of the subpoenas.

159.    The subpoenas, issued on July 8, 2010, sought production of documents in connection with six securitizations in which First Horizon had acted as the sponsor, seller, and master servicer—including all five Securitizations at issue in this case.  Among the information sought were the loan origination files relating to the loans in the Securitizations, files exclusively or particularly within Defendant First Tennessee's control.  The subpoenas required that the recipient produce the requested material within 30 days of receipt—*i.e.*, by August 8, 2010.

160.    Because First Tennessee to date has failed to comply with the subpoenas and produced only documents missing critical data files, such as the loan file numbers, that were necessary to render usable the data actually produced, FHFA was compelled to bring a petition to enforce the subpoenas.  *See Fed. Housing Finance Agency v. First Tennessee Bank N.A.*, No. 11-mc-00697 (D.D.C.).  First Tennessee opposed the enforcement of the subpoenas and successfully moved to transfer venue of the dispute to the United States District Court for the Southern District of New York.  *See Fed. Housing Finance Agency v. First Tennessee Bank N.A.*, No. 11-mc-00697, 2012 WL 1388201 (RBW) (D.D.C. Apr. 23, 2012).

161.    Pending enforcement of the subpoenas issued by FHFA in July 2010, or a disposition or resolution of the subpoena enforcement action that results in complete production of loan origination files, those files remain in the exclusive or particular possession of Defendant First Tennessee and cannot be reviewed by Plaintiff.  Only since this Court has ordered that discovery should proceed in this matter has Defendant First Tennessee begun discussions with FHFA about a possible resolution of FHFA's petition to enforce the subpoenas.

2.    **The Collapse of the GSE Certificates' Credit Ratings Further Indicates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines**

162.    The total collapse in the credit ratings of the GSE Certificates, typically from AAA or its equivalent to non-investment speculative grade, is further evidence of the originators' systematic disregard of underwriting guidelines, amplifying that the GSE Certificates were impaired from the start.

163.    The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statement. These ratings were artificially inflated, however, as a result of the very same misrepresentations that Defendants made to investors in the Prospectus Supplements.

164.    Defendants provided or caused to be provided loan-level information, including the borrower's LTV ratio, debt-to-income ratio, owner-occupancy status, and other loan-level information described in aggregation reports in the Prospectus Supplements, to the rating agencies.  The rating agencies in turn relied on this information to calculate the Certificates' assigned credit ratings.  Because the information that Defendants provided or caused to be provided was materially false, the models used by the rating agencies under-predicted the likelihood of default, as well as the loss severity.  As a result of the false information provided by Defendants, the Securitizations lacked the level of subordination required for the certificates to be truly rated AAA (or its equivalent), and investors, including Fannie Mae and Freddie Mac, were deprived of the level of protection commensurate with a true AAA (or its equivalent) rating.  As a result, the GSEs paid Defendants inflated prices for purported AAA Certificates (or their equivalent) unaware that those Certificates in reality carried a greater risk of loss and inadequate credit enhancement, and thus should not have been rated AAA (or its equivalent).

165.     The GSEs could not have discovered facts indicating Defendants' false and misleading statements and omissions prior to, at the earliest, December 18, 2008 for Freddie Mac and December 17, 2008 for Fannie Mae.  These are the first dates on which any of the certificates purchased by the GSEs were downgraded below investment grade by a credit ratings agency.  In subsequent months and years, all of the GSE Certificates were downgraded by the credit rating agencies from AAA (or its equivalent) to below investment grade.  Prior to the initial downgrades in mid-December 2008, the GSEs had no basis to suspect Defendants' widespread misrepresentations and omissions of material fact in the Registration Statements. After these downgrades, it required significant investigation and fact-finding for the GSEs to formulate the claims stated herein.  The downgrades beginning in mid-December 2008 raised questions regarding the true underwriting practices used to originate the mortgage loans, and the mortgage loans' true value and credit quality.  Table 8 details the extent of the downgrades.[9]

**Table 8**

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating as of April 30, 2012 (Moody's/S&P/Fitch) |
|---|---|---|---|
| FHAMS 2005-AA9 | II-A-1 | Aaa/--/AAA | Caa3/--/D |
| FHAMS 2005-AA10 | I-A-1 | Aaa/AAA/-- | Caa3/D/-- |
| FHAMS 2005-AA11 | I-A-1 | Aaa/--/AAA | Caa3/--/D |
| FHAMS 2005-AA12 | II-A-1 | Aaa/AAA/-- | Caa3/D/-- |
| FHAMS 2006-AA1 | I-A-1 | Aaa/--/AAA | Ca/--/D |

---

[9]     Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch.  A hyphen after a forward-slash indicates that the relevant agency did not provide a rating at issuance.

### 3. The Surge in Mortgage Delinquencies and Defaults Further Demonstrates that the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

166.    Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders.  The overall poor performance of the mortgage loans is further evidence of and a direct consequence of the fact that they were not underwritten in accordance with the applicable underwriting guidelines as represented in the Registration Statement.

167.    Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statement would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.  Table 9 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of March 2012.

**Table 9**

| Transaction | Supporting Loan Group | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| FHAMS 2005-AA9 | Group 2 | 19.1 |
| FHAMS 2005-AA10 | Group 1 | 18.0 |
| FHAMS 2005-AA11 | Group 1 | 17.1 |
| FHAMS 2005-AA12 | Group 2 | 20.4 |
| FHAMS 2006-AA1 | Group 1 | 22.6 |

168.    The confirmed misstatements concerning owner occupancy and LTV ratios; the confirmed systematic underwriting failures by First Horizon; and the extraordinary drop in credit ratings and rise in delinquencies across those Securitizations, all confirm that the mortgage loans

in the Supporting Loan Groups, contrary to the representations in the Registration Statement, were not originated in accordance with the stated underwriting guidelines.

## V. FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES

169.   In total, between September 30, 2005, and April 30, 2007, Fannie Mae and Freddie Mac purchased $883 million in residential mortgage-backed securities issued in connection with the Securitizations.  Table 10 reflects Freddie Mac's purchases of the Certificates.[10]

### Table 10

| Transaction | Tranche | CUSIP | Settlement Date of Purchase By Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| FHAMS 2005-AA9 | II-A-1 | 32051GXE0 | Sept. 30, 2005 | $191,439,000 | 101.482 | Merrill Lynch |
| | II-A-1 | 32051GXE0 | Oct. 28, 2005 | $22,591,000 | 100.805 | Merrill Lynch |
| FHAMS 2005-AA10 | I-A-1 | 32051GA54 | Oct. 31, 2005 | $140,430,000 | 100.945 | FTN |
| FHAMS 2005-AA11 | I-A-1 | 32051GH40 | Nov. 30, 2005 | $128,755,000 | 100.467 | UBS |

170.   Table 11 reflects Fannie Mae's purchases of the Certificates:

### Table 11

| Transaction | Tranche | CUSIP | Settlement Date of Purchase By Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| FHAMS 2005-AA12 | II-A-1 | 32051GQ81 | Apr. 30, 2007 | $160,535,700 | 100.8281 | Bear Stearns (now JPM Securities) |
| FHAMS 2006-AA1 | I-A-1 | 32051GV28 | Feb. 28, 2006 | $230,020,000 | 101.2578 | Credit Suisse |

---

[10]   Purchased securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

171.    The statements and assurances in the Registration Statement regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents, were material to a reasonable investor's, including the GSEs', decision to purchase the GSE Certificates.  A reasonable investor, such as the GSEs, would have understood that Defendants were responsible for the contents of those Registration Statements, and that would have influenced its purchasing decision.

172.    The false statements of material facts and omissions of material facts in the Registration Statement, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer hundreds of millions of dollars in damages, including without limitation depreciation in the value of the Certificates.  The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statement, and the payments to the trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statement.

173.    Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

174.    Defendants' misstatements and omissions in the Registration Statement regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchases of the GSE Certificates.  Fannie Mae and Freddie Mac did not know of Defendants' misstatements and omissions at the time they purchased the Certificates. Defendants' misstatements and omissions both understated the risk and overstated the value of the GSE Certificates, and had the GSEs known of these misstatements and omissions, they

would not have purchased the GSE Certificates. Defendants' misrepresentations and omissions, which proximately caused the GSEs' losses, also contributed to the Nation's housing crisis.

175.    Based upon sales of the Certificates or similar certificates in the secondary market, Defendants proximately caused hundreds of millions of dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at trial.

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933
### (Against the Underwriter Defendants)

176.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.

177.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statement for the Securitizations listed in paragraph 2.

178.    This claim is predicated upon the strict liability of the Underwriter Defendants FTN, UBS, JP Morgan Securities (as successor-in-interest to Bear Stearns), Credit Suisse, and Merrill Lynch for making false and materially misleading statements in the Registration Statement, as applicable to one or more Securitizations and for omitting facts necessary to make the facts stated therein not misleading.

179.    FTN, UBS, JP Morgan Securities (as successor-in-interest to Bear Stearns), Credit Suisse, and Merrill Lynch served as underwriters for one or more Securitizations (as specified in Table 1, *supra* at paragraph 36), within the meaning of Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). and as such, are liable for the misstatements and omissions in the

Registration Statement under Section 11 of the Securities Act.  As discussed *supra* at paragraphs 98 to 106, JP Morgan Securities is the successor-in-interest to Bear Stearns' liabilities.

180.    At the time it became effective, the Registration Statement contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading, as set forth above.  The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statement, including to Fannie Mae and Freddie Mac.

181.    The untrue statements of material facts and omissions of material facts in the Registration Statement are set forth above in Section IV, and pertain to, among other things, compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

182.    Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates in the primary market pursuant to the materially false, misleading, and incomplete Registration Statement.  At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the facts concerning the false and misleading statements and omissions alleged herein, and if the GSEs had known those facts, they would not have purchased the GSE Certificates.

183.    The Underwriter Defendants FTN, UBS, JP Morgan Securities (as successor-in-interest to Bear Stearns), Credit Suisse, and Merrill Lynch owed to Fannie Mae, Freddie Mac, and other investors a duty to make a reasonable and diligent investigation of the statements contained in the applicable Registration Statement at the time it became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

184.    The Underwriter Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statement, as set forth herein.

185.    Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statement, for which they are entitled to compensation.

186.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).  In addition, the time period from July 29, 2011 through August 29, 2011 has been tolled for statute of limitation purposes as against Credit Suisse by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, and Credit Suisse (USA) Inc.

187.    By reason of the conduct herein alleged the Underwriter Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the Securities Act of 1933
### (Against First Horizon Asset Securities, FTN, UBS, Credit Suisse, and Merrill Lynch)

188.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.

189.    This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statement in the Securitizations listed in paragraph 2.

190.     This claim is predicated upon the negligence of Underwriter Defendants FTN, UBS, Credit Suisse, and Merrill Lynch (the "Section 12 Underwriter Defendants") for making false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for one or more of the Securitizations.  This cause of action is asserted against each Section 12 Underwriter Defendant only for the Securitizations in which that underwriter is listed as the seller to Fannie Mae or Freddie Mac in Tables 10 and 11, *supra* at paragraphs 169 to 170.  This cause of action is asserted against Defendant First Horizon Asset Securities for all of the Securitizations except FHAMS 2005-AA12, for negligence in making false and materially misleading statements in those securitizations' Prospectuses.

191.     Each of the Section 12 Underwriter Defendants is prominently identified in the Prospectuses, the primary documents they used to sell the GSE Certificates.  The Section 12 Underwriter Defendants offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Method of Distribution" sections of the Prospectuses.

192.     The Section 12 Underwriter Defendants offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  The Section 12 Underwriter Defendants reviewed and participated in drafting the Prospectuses.

193.     The Section 12 Underwriter Defendants successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates.  As underwriters, the Section 12 Underwriter

Defendants obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

194.    The Section 12 Underwriter Defendants offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce, including communications between their representatives in New York and representatives of Fannie Mae in the District of Columbia and Freddie Mac in McLean, Virginia.

195.    First Horizon Asset Securities is prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that it filed.  These Prospectuses were the primary documents used to sell the GSE Certificates in the Securitizations under those Registration Statements, and each Prospectus provided contact information for First Horizon Asset Securities in the event that investors had questions about their potential investment.  First Horizon Asset Securities, a statutory seller, prepared the offering materials, offered the Certificates publicly, and actively solicited their sale, including to Fannie Mae and Freddie Mac, for the benefit of First Horizon National.  First Horizon Asset Securities was motivated to do so in order to further the interests of First Horizon National, First Horizon Home Loan, and FTN. In addition, First Horizon Asset Securities earned substantial fees and benefits from a fully subscribed securitization, including its ability to market future securitizations.

196.    First Horizon Asset Securities offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  First Horizon Asset Securities reviewed and participated in drafting the Prospectuses.

197.    First Horizon Asset Securities offered the GSE Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

198.    Each of the Section 12 Underwriter Defendants and First Horizon Asset Securities actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statement, filing the Registration Statement, and assisting in marketing the GSE Certificates.

199.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and specifically to Fannie Mae and Freddie Mac.

200.    The untrue statements of material facts and omissions of material fact in the Registration Statement, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

201.    The Section 12 Underwriter Defendants and Defendant First Horizon Asset Securities offered and sold the GSE Certificates directly to Fannie Mae and Freddie Mac pursuant to the materially false, misleading, and incomplete Prospectuses.

202.    The Section 12 Underwriter Defendants and Defendant First Horizon Asset Securities owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.

203.    The Section 12 Underwriter Defendants and Defendant First Horizon Asset Securities failed to exercise such reasonable care.  These defendants, in the exercise of reasonable care, should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

204.    In contrast, Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If the GSEs had known of those untruths and omissions, they would not have purchased the GSE Certificates.

205.    Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses.

206.    Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

207.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).  In addition, the time period from July 29, 2011 through August 29, 2011 has been tolled for statute of limitation purposes as against Credit Suisse by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, and Credit Suisse (USA) Inc.

## THIRD CAUSE OF ACTION

**Violation of Section 15 of the Securities Act of 1933**
**(Against First Horizon National, First Tennessee, and the Individual Defendants)**

208.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.

209.    This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against First Horizon National, First Tennessee, and the Individual Defendants for controlling-person liability with regard to the Section 12(a)(2) cause of action set forth above.  This claim is also against First Horizon National, First Tennessee, Defendant Gerald L. Baker, and Defendant Charles G. Burkett with regard to the Section 11 cause of action set forth above.

210.    The Individual Defendants at all relevant times participated in the operation and management of First Horizon Asset Securities, and conducted and culpably participated, either directly or indirectly, in the conduct of First Horizon Asset Securities' business affairs.  Further, Defendants Gerald L. Baker and Charles G. Burkett at all relevant times participated in the operation and management of FTN, and conducted and participated, either directly or indirectly, in the conduct of FTN's business affairs.

211.    At the time of the Securitizations, Individual Defendant Gerald L. Baker was: (a) the Chief Executive Officer, President, and a Director of Defendant First Horizon Asset Securities; (b) the Chief Executive Officer and President of Defendant First Tennessee; and (c) the President and Chief Executive Officer of Defendant First Horizon National.

212.    At the time of the Securitizations, Individual Defendant Peter F. Makowiecki was: (a) the Chief Financial Officer and Treasurer of Defendant First Horizon Asset Securities; and

70

(b) the President and Chief Executive Officer of Defendant First Horizon Home Loan beginning in January 2006, after previously serving as its Chief Financial Officer.

213.    At the time of the Securitizations, Individual Defendant Charles G. Burkett was: (a) a Director of First Horizon Asset Securities; (b) the President of Banking of Defendant First Tennessee, and (c) the President of Banking of Defendant First Horizon National.

214.    At the time of the Securitizations, Individual Defendant Thomas J. Wageman was a Director of Defendant First Horizon Asset Securities.

215.    Because of their positions of authority and control as senior officers and directors, the Individual Defendants were able to, and in fact did, control the contents of the Shelf Registration Statement, including the related Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

216.    First Horizon Home Loan (now Defendant First Tennessee) was the sponsor of the Securitizations carried out under the Registration Statement and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above by initiating the Securitizations, originating or purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the depositor First Horizon Asset Securities as the special-purpose vehicle, and selecting the underwriters.  In its role as sponsor, First Horizon Home Loan knew and intended that the mortgage loans it originated or purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

217.    First Horizon Home Loan (now Defendant First Tennessee) also acted as the seller of the mortgage loans for the Securitizations in that it conveyed such mortgage loans to

71

Defendant First Horizon Asset Securities, its wholly owned subsidiary, pursuant to a Mortgage Loan Purchase Agreement.

218.    First Horizon Home Loan (now Defendant First Tennessee) also controlled all aspects of the business of First Horizon Asset Securities because First Horizon Asset Securities was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, the officers and directors of First Horizon Home Loan, as well as its former parent companies First Tennessee and First Horizon National, overlapped with the officers and directors of First Horizon Asset Securities. For example, Individual Defendants Baker, Makowiecki, and Burkett all served contemporaneously as officers and directors of First Horizon Asset Securities, First Tennessee, and First Horizon National at the time of the Securitizations.  In addition, because of its position as sponsor, First Horizon Home Loan was able to, and did in fact, control the contents of the Registration Statement filed by First Horizon Asset Securities, including the Prospectuses and Prospectus Supplements, which pertained to each of the Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

219.    Defendant First Tennessee is also liable for the control it exercised at the time of the Securitizations.  It was the "custodian" of the loan files in all of the Securitizations, and even passed title to the loans in the FHAMS 2005 AA10 transaction.  Further, as the direct parent and controlling entity of First Horizon Home Loan and the parent of Defendant FTN, First Tennessee had the practical ability to direct and control the actions of First Horizon Asset Securities and FTN in issuing, selling, and underwriting the Certificates, and in fact exercised such direction

and control over the activities of First Horizon Asset Securities and FTN in connection with the issuance and sale of the Certificates.

220.    Thus, in addition to its liability as successor to First Horizon Home Loan, First Tennessee culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statement and establish special-purpose financial entities such as First Horizon Asset Securities and the issuing trusts to serve as conduits for the mortgage loans.

221.    Defendant First Horizon National controlled the business operations of First Horizon Asset Securities and FTN.  As the sole owner and ultimate corporate parent of First Horizon Asset Securities and FTN, First Horizon National had the practical ability to direct and control the actions of First Horizon Asset Securities and FTN in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of First Horizon Asset Securities and FTN in connection with the issuance and sale of the Certificates.

222.    First Horizon National expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits.  The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statement.

223.    First Horizon National culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statement and establish special-purpose financial entities such as First Horizon Asset Securities and the issuing trusts to serve as conduits for the mortgage loans.

224.    First Horizon National, First Tennessee (including as successor to First Horizon Home Loan), and the Individual Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of First Horizon Asset Securities, First Horizon Home Loan, and FTN at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statement.  By virtue of the coordinated participation of affiliated First Horizon Defendants, First Horizon National generated profits at multiple levels of the securitization process.

225.    Fannie Mae and Freddie Mac purchased in the primary market Certificates issued pursuant to the Registration Statement, including the Prospectuses and Prospectus Supplements, which, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statement, and specifically to Fannie Mae and Freddie Mac.

226.    Fannie Mae and Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statement; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

227.    Fannie Mae and Freddie Mac have sustained substantial damages as a result of the misstatements and omissions in the Registration Statement, for which they are entitled to compensation.

228.    This action is brought within three years of the date that FHFA was appointed as Conservator of Fannie Mae and Freddie Mac, and is thus timely under 12 U.S.C. § 4617(b)(12).

## FOURTH CAUSE OF ACTION

**Violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code
(Against First Horizon Asset Securities, JP Morgan Securities, and Credit Suisse)**

229.   Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.

230.   This claim is brought by Plaintiff pursuant to Section 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  This cause of action is asserted against Defendant JP Morgan Securities (as successor-in-interest to Bear Stearns) only with respect to the FHAMS 2005-AA12 Securitization, against Defendant Credit Suisse only with respect to the FHAMS 2006-AA1 Securitization, and against Defendant First Horizon Asset Securities with respect to both of these Securitizations.

231.   This claim is predicated upon the negligence of Underwriter Defendants JP Morgan Securities (as successor-in-interest to Bear Stearns) and Credit Suisse for making false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the Securitizations specified in the preceding paragraph.  Bear Stearns and Credit Suisse negligently made false and materially misleading statements in the Prospectuses for the Securitizations.  As discussed *supra* at paragraphs 98 to 106, JP Morgan Securities is the successor-in-interest to Bear Stearns' liabilities.  Defendant First Horizon Asset Securities was also negligent in making false and materially misleading statements in the Prospectuses applicable to these two Securitizations.

232.   Bear Stearns (now JP Morgan Securities) and Credit Suisse are prominently identified in the Prospectuses, the primary documents they used to sell the GSE Certificates.

75

Bear Stearns and Credit Suisse offered the Certificates publicly, including selling to Fannie Mae their GSE Certificates, as set forth in the "Method of Distribution" sections of the Prospectuses.

233.    Bear Stearns (now JP Morgan Securities) and Credit Suisse offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  Bear Stearns and Credit Suisse reviewed and participated in drafting the Prospectuses.

234.    Bear Stearns (now JP Morgan Securities) and Credit Suisse successfully solicited Fannie Mae's purchases of the GSE Certificates.  As underwriters, Bear Stearns and Credit Suisse obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

235.    Bear Stearns (now JP Morgan Securities) and Credit Suisse offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

236.    First Horizon Asset Securities is prominently identified in the Prospectuses for FHAMS 2005-AA12 and FHAMS 2006-AA1.  These Prospectuses were the primary documents used to sell the GSE Certificates to Fannie Mae, and each Prospectus provided contact information for First Horizon Asset Securities in the event that investors had questions about their potential investment.  First Horizon Asset Securities, a statutory seller, prepared the offering materials, offered the Certificates publicly and actively solicited their sale, including to Fannie Mae, for the benefit of First Horizon National.  First Horizon Asset Securities was motivated to do so in order to further the interests of First Horizon National, First Horizon Home Loan, and FTN.  In addition, First Horizon Asset Securities earned substantial fees and benefits from a fully subscribed securitization, including its ability to market future securitizations.

237.    First Horizon Asset Securities offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  First Horizon Asset Securities reviewed and participated in drafting the Prospectuses.

238.    Each of Bear Stearns, Credit Suisse, and First Horizon Asset Securities actively participated in the solicitation of the Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statement, filing the Registration Statement, and assisting in marketing the GSE Certificates.

239.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and specifically to Fannie Mae.

240.    The untrue statements of material facts and omissions of material fact in the Registration Statement, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

241.    Bear Stearns (now JP Morgan Securities), Credit Suisse, and First Horizon Asset Securities offered and sold the GSE Certificates directly to Fannie Mae pursuant to the materially false, misleading, and incomplete Prospectuses.

242.    Bear Stearns (now JP Morgan Securities), Credit Suisse, and First Horizon Asset Securities owed to Fannie Mae, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure

that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.

243.    Bear Stearns (now JP Morgan Securities), Credit Suisse, and First Horizon Asset Securities failed to exercise such reasonable care.  These Defendants, in the exercise of reasonable care, should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

244.    In contrast, Fannie Mae did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates.  If Fannie Mae had known of those untruths and omissions, it would not have purchased the GSE Certificates.

245.    Fannie Mae sustained substantial damages in connection with their investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

246.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae, and is thus timely under 12 U.S.C. § 4617(b)(12).  In addition, the time period from July 29, 2011 through August 29, 2011 has been tolled for statute of limitation purposes as against Credit Suisse by virtue of a tolling agreement entered into between FHFA, Fannie Mae, Freddie Mac, and Credit Suisse (USA) Inc.

## FIFTH CAUSE OF ACTION

### Violation of Section 31-5606.05(c) of the District of Columbia Code
### (Against First Horizon National, First Tennessee, and the Individual Defendants)

247.    Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraudulent or intentional or reckless conduct.

248.    This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae, which purchased the FHAMS 2005-AA12 and FHAMS 2006-AA1 GSE Certificates.  This claim is brought against First Horizon National, First Tennessee, and the Individual Defendants for controlling-person liability with regard to the Fourth Cause of Action set forth above.

249.    The Individual Defendants at all relevant times participated in the operation and management of First Horizon Asset Securities, and conducted and participated, either directly or indirectly, in the conduct of First Horizon Asset Securities' business affairs.

250.    At the time of the Securitizations, Individual Defendant Gerald L. Baker was: (a) the Chief Executive Officer, President, and a Director of Defendant First Horizon Asset Securities; (b) the Chief Executive Officer and President of Defendant First Tennessee; and (c) the President and Chief Executive Officer of Defendant First Horizon National.

251.    At the time of the Securitizations, Individual Defendant Peter F. Makowiecki was: (a) the Chief Financial Officer and Treasurer of Defendant First Horizon Asset Securities; and (b) the President and Chief Executive Officer of Defendant First Horizon Home Loan beginning in January 2006, after previously serving as its Chief Financial Officer.

252.     At the time of the Securitizations, Individual Defendant Charles G. Burkett was: (a) a Director of First Horizon Asset Securities; (b) the President of Banking of Defendant First Tennessee, and (c) the President of Banking of Defendant First Horizon National.

253.     At the time of the Securitizations, Individual Defendant Thomas J. Wageman was a Director of Defendant First Horizon Asset Securities.

254.     Because of their positions of authority and control as senior officers and directors, the Individual Defendants were able to, and in fact did, control the contents of the Shelf Registration Statement, including the related Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

255.     First Horizon Home Loan (now Defendant First Tennessee) was the sponsor of the Securitizations carried out under the Registration Statement and culpably participated in the violation of Section 31-5606.05(a)(1)(B) set forth above by initiating the Securitizations, originating or purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the depositor First Horizon Asset Securities as the special-purpose vehicle, and selecting Bear Stearns (now JP Morgan Securities) and Credit Suisse as underwriters.  In its role as sponsor, First Horizon Home Loan knew and intended that the mortgage loans it originated or purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

256.     First Horizon Home Loan (now Defendant First Tennessee) also acted as the seller of the mortgage loans for the Securitizations in that it conveyed such mortgage loans to Defendant First Horizon Asset Securities, its wholly owned subsidiary, pursuant to a Mortgage Loan Purchase Agreement.

257.    First Horizon Home Loan (now Defendant First Tennessee) also controlled all aspects of the business of First Horizon Asset Securities because First Horizon Asset Securities was merely a special purpose entity that was created for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, the officers and directors of First Horizon Home Loan, as well as its former parent companies First Tennessee and First Horizon National, overlapped with the officers and directors of First Horizon Asset Securities. For example, Individual Defendants Baker, Makowiecki, and Burkett all served contemporaneously as officers and directors of First Horizon Asset Securities, First Tennessee, and First Horizon National at the time of the Securitizations.  In addition, because of its position as sponsor, First Horizon Home Loan was able to, and did in fact, control the contents of the Registration Statement filed by First Horizon Asset Securities, including the Prospectuses and Prospectus Supplements, which pertained to each of the Securitizations and which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

258.    Defendant First Tennessee is also liable for the control it exercised at the time of the Securitizations.  It was the "custodian" of the loan files.  Further, as the direct parent and controlling entity of First Horizon Home Loan, First Tennessee had the practical ability to direct and control the actions of First Horizon Asset Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of First Horizon Asset Securities in connection with the issuance and sale of the Certificates.

259.    Thus, in addition to its liability as successor to First Horizon Home Loan, First Tennessee culpably participated in the violation of Section 31-5606.05(a)(1)(B) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans'

characteristics in the Registration Statement and establish special-purpose financial entities such as First Horizon Asset Securities and the issuing trusts to serve as conduits for the mortgage loans.

260. Defendant First Horizon National controlled the business operations of First Horizon Asset Securities. As the sole owner and ultimate corporate parent of First Horizon Asset Securities, First Horizon National had the practical ability to direct and control the actions of First Horizon Asset Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of First Horizon Asset Securities in connection with the issuance and sale of the Certificates.

261. First Horizon National expanded its share of the residential mortgage-backed securitization market in order to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statement.

262. First Horizon National culpably participated in the violations of Section 31-5606.05(a)(1)(B) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statement and establish special-purpose financial entities such as First Horizon Asset Securities and the issuing trusts to serve as conduits for the mortgage loans.

263. First Horizon National, First Tennessee (including as successor to First Horizon Home Loan), and the Individual Defendants are controlling persons within the meaning of Section 31-5606.05(c) of the District of Columbia Code by virtue of their actual power over, control of, ownership of, and/or directorship of First Horizon Asset Securities and First Horizon Home Loan at the time of the wrongs alleged herein and as set forth herein, including their

control over the content of the Registration Statement.  By virtue of the coordinated participation of affiliated First Horizon Defendants, First Horizon National generated profits at multiple levels of the securitization process.

264.    Fannie Mae purchased the GSE Certificates, which were issued pursuant to the Registration Statement, including the Prospectuses and Prospectus Supplements, which, at the time it became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statement, and specifically to Fannie Mae.

265.    Fannie Mae did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statement; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificates.

266.    Fannie Mae has sustained substantial damages as a result of the misstatements and omissions in the Registration Statement, for which it is entitled to compensation.

267.    This action is brought within three years of the date that the FHFA was appointed as Conservator of Fannie Mae, and is thus timely under 12 U.S.C. § 4617(b)(12).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

268.    An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

a.      Rescission and recovery of the consideration paid for the GSE Certificates, with interest thereon;

b.      Each GSE's monetary losses, including any diminution in value of the GSE Certificates, lost principal and lost interest payments thereon, and consequential damages,

including the cost of investigating the misrepresentations and performance of the underlying collateral to the Certificates, as well as any increased coupon payment on the GSEs' senior preferred stock held by the U.S. Treasury Department, arising from losses on the GSE Certificates;

      c.     Interest, attorneys' fees, and costs;

      d.     Prejudgment interest at the maximum legal rate; and

      e.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

269.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:   New York, New York
           June 28, 2012

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By: _____
    Christine H. Chung

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency*

84